James D. **NORA**, Plaintiff–Appellant,

v.

**CARRIER CORPORATION & United Technologies, Defendants–Appellees.**

No. 86–1459.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 17, 1987.

Decided Nov. 14, 1988.

John J. Nora (argued), Nora, Hemming, Essad and Polaczyk, P.C., Geno D. Salo-

mone, Plymouth, Mich., for plaintiff-appellant.

Richard J. Seryak (argued), Miller, Canfield, Paddock & Stone, Detroit, Mich., Linda O. Goldberg, Miller, Canfield, Paddock & Stone, Ann Arbor, Mich., for defendants-appellees.

Before MARTIN and NELSON, Circuit Judges, and CONTIE, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

In December of 1982, pursuant to the same sort of "economically mandated reduction in force" with which we were concerned in *Boynton v. TRW, Inc.*, 858 F.2d 1178, 1179 (6th Cir.1988) (en banc), defendant Carrier Corporation discharged plaintiff James Nora from his employment with the company. Mr. Nora brought a diversity action against Carrier in federal district court, alleging both intentional and negligent breach of implied and express employment contract rights. The district court entered summary judgment for Carrier, and Mr. Nora appealed. For the reasons set forth below, we shall affirm the judgment of the district court.

Mr. Nora began working for Carrier in 1967, following his graduation from college. The company assured him that he would receive fair and caring treatment as an employee. Although he had concerns about some of the terms of the employment contract he was invited to sign, he was satisfied by the company's oral assurances and relied on them in accepting the company's offer of employment.

The contract that Mr. Nora signed permitted discharge "at will without notice" during the first six months of employment; advance notice would be required thereafter, the contract provided, except in the case of discharge for cause, but the clear implication of the contract was that subject to the giving of the required notice, Mr. Nora could always be discharged "at will." By its terms, the contract "supersed[ed] any and all agreements of every kind, relating to [the] employment...." The contract concluded with the following language: "This agreement cannot be changed, nor any provision thereof waived, except by mutual consent in writing."

In 1969, after working for two years as a sales trainee, Mr. Nora was promoted to a salesperson's position. In 1973 he was promoted to the position of branch manager. From 1973 through December of 1981 he was the manager and sole member of Carrier's Machinery and Systems Division branch in Grand Rapids, selling heavy commercial equipment for large construction projects.

In December of 1981 Carrier consolidated its Machinery and Systems Division with its Distribution Sales Division. Mr. Nora lost his branch manager status as a result of the consolidation, but continued to be employed as one of three salespeople working out of the Grand Rapids office. The other two were Gary Ehlers, the manager of the combined operation, and H. Peter Sexton, a full-time salesperson. Both Mr. Ehlers and Mr. Sexton had more experience in light equipment sales than Mr. Nora did.

In 1982 and 1983 the Grand Rapids branch did not sell any of the heavy commercial equipment that Mr. Nora had specialized in. In September of 1982, as part of a nationwide reduction in its workforce, Carrier placed Mr. Nora on layoff status with full salary and benefits. Mr. Sexton was kept on the job. This decision was made by Mr. Ehlers on the basis of a determination that Mr. Sexton's ability, potential, and relevant experience were superior to Mr. Nora's, even though Mr. Sexton had substantially less seniority than Mr. Nora did.

After the layoff Carrier offered Mr. Nora an opportunity to serve as a branch manager at its Machinery and Systems Division in Oklahoma City, Oklahoma. Mr. Nora rejected the offer even though he would have received a salary and benefits identical to those he had received as a branch manager in Grand Rapids.

Carrier discharged Mr. Nora in December of 1982. Two years later he brought suit. Relying on *Toussaint v. Blue Cross and Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980), where the Mi-

chigan Supreme Court held that an employer's policy statements to the effect that employment for an indefinite term would only be terminated "for cause" could give rise to legally enforceable contract rights even without evidence that the parties had mutually agreed that the policy statements would create such rights, Mr. Nora alleged in his complaint that "the statements contained in Defendant's policy, procedures, standard practice, appraisals, and past history of operation create[d] express contracts of employment." The complaint quoted statements from Carrier's "Standard Practice Instruction" indicating that layoffs among employees would be made according to seniority and would be supported by specific documentation.

In *Renny v. Port Huron Hospital*, 427 Mich. 415, 417–18, 398 N.W.2d 327, 329 (1986), the Michigan Supreme Court clarified the *Toussaint* doctrine by explaining that "[t]he existence of a just-cause contract is a question of fact for the jury where the employer establishes written policies and procedures by which to discharge an employee, *but does not expressly retain the right to terminate employees at will.*" (Emphasis supplied.) The hospital handbook on which the plaintiff relied in *Renny* contained this language: "The Hospital retains the sole right to manage and operate the Hospital. This includes, but is not limited to, the sole and exclusive right ... to hire, lay off, discipline, discharge, assign, transfer, and promote employees...." *Id.* at 427, 398 N.W.2d at 333–34. The handbook did not expressly retain the right to terminate employment at will, and the omission of such a provision enabled the Michigan court to affirm a judgment for the plaintiff employee based on the finding of a jury that as a matter of fact the employee handbook established an employment contract allowing discharge only for "just cause."

The *Renny* handbook provided that "[t]hese rights are subject only to the regulations and restrictions outlined in this Employee Handbook," *id.* at 427, 398 N.W.2d at 334 (emphasis omitted), and the court cited this language in explaining that "[w]hile the hospital maintained the sole right to discharge employees, this right was expressly subject to the regulations and restrictions provided for in the handbook." *Id.* at 430, 398 N.W.2d at 335. The court went on to say that

"There is no express statement within the handbook that employees were still terminable at the will of the hospital. While the management rights clause implies that the employer could revise its policies unilaterally, there was no evidence presented at trial that defendant hospital had altered any of the policies upon which plaintiff relied. Indeed, any suggestion that the hospital could fire an employee at will despite the express statements in its handbook and without evidence of a policy change would imply that the handbook was a sham."

*Id.* at 431–32, 398 N.W.2d at 336.

The employer in the case at bar retained the right that was not retained by the employer in *Renny*. Mr. Nora signed an employment agreement that included these provisions, among others:

"IN CONSIDERATION OF MY EMPLOYMENT ..., I HEREBY AGREE AS FOLLOWS:

.   .   .   .   .

5. THAT SALARY FOR MY SERVICES SHALL BE PAID BY THE CORPORATION BIWEEKLY OR SEMI-MONTHLY AND SHALL CONSTITUTE MY BASE SALARY WHICH IS THE REGULAR RATE OF PAY AT WHICH I AM EMPLOYED, UNTIL SIX CALENDAR MONTHS HAVE EXPIRED AFTER THE DATE ON WHICH MY EMPLOYMENT BEGAN *MY EMPLOYMENT MAY BE TERMINATED BY ME OR BY THE CORPORATION AT WILL* WITHOUT NOTICE AND THE CORPORATION SHALL NOT BE LIABLE FOR WAGES OR SALARY PAYMENTS AFTER SUCH DATE OF TERMINATION, AFTER THE EXPIRATION OF SIX CALENDAR MONTHS FROM THE DATE ON WHICH MY EMPLOYMENT BEGAN MY EMPLOYMENT MAY BE TERMINATED BY ME OR BY THE CORPORATION (EXCEPT FOR

CAUSE) ONLY ON THE EXPIRATION OF 1 WEEK'S NOTICE. AFTER THE EXPIRATION OF 12 CALENDAR MONTHS FROM THE DATE ON WHICH MY EMPLOYMENT BEGAN MY EMPLOYMENT MAY BE TERMINATED BY ME OR BY THE CORPORATION (EXCEPT FOR CAUSE) ONLY ON THE EXPIRATION OF 2 WEEKS' NOTICE.

6. MY WORK FOR THE CORPORATION AND RIGHT TO COMPENSATION SHALL BE GOVERNED BY ALL PRESENT AND FUTURE RULES AND REGULATIONS OF THE CORPORATION PERTAINING TO ATTENDANCE, VACATIONS, SICK LEAVE, LAYOFFS, LEAVES OF ABSENCE, RETIREMENT, TRANSFERS, TERMINATION, PHYSICAL EXAMINATION AND HEALTH SERVICES AND GENERAL CONDUCT, AND I AGREE TO ABIDE BY SUCH RULES AND REGULATIONS.

7. THIS AGREEMENT, EXECUTED IN DUPLICATE, SUPERSEDES ANY AND ALL AGREEMENTS OF EVERY KIND, RELATING TO MY EMPLOYMENT AND/OR RELATING TO PATENTS AND/OR PATENT RIGHTS HERETOFORE ENTERED INTO BY AND BETWEEN THE CORPORATION AND ME. THIS AGREEMENT CANNOT BE CHANGED, NOR ANY PROVISION THEREOF WAIVED, EXCEPT BY MUTUAL CONSENT IN WRITING." (Emphasis supplied, punctuation as in original.)

Paragraph 5 of the employment contract clearly permitted Carrier to terminate Mr. Nora's employment "at will without notice" during the first six months, at will with one week's notice during the next six months, and at will with two weeks' notice thereafter. If the right to terminate Mr. Nora's employment "at will" had not been intended to continue throughout the period of employment, there would have been no reason to provide that after the first six months the employment could be terminated—"except for cause"—only on the expiration of one week's notice or two week's notice. If it had been intended that after the first six months of employment Mr. Nora could only be discharged for cause, it would have been simple enough to say so. By saying instead that the employment could not be terminated without the requisite notice "except for cause," the contract clearly told Mr. Nora that he could always be discharged at will, subject to the giving of the requisite notice. Carrier thus having retained the sort of termination right that was not retained by the employer in *Renny*, we have no doubt that under Michigan law Carrier could do what the employer in *Renny* could not do: terminate the employment "at will," after giving the notice required in the contract.

There is nothing to the contrary in *Toussaint*. Like the employer in *Renny*, the employer in *Toussaint* was unable to point to an employment contract expressly reserving the right to discharge the employee "at will." Accordingly, the *Toussaint* court framed the issue in that case thus: "whether, . . . assuming an employment contract for an indefinite term, the employment *must* be terminable at will so that the employer could not enter into a legally enforceable agreement to terminate the employment only for cause." *Toussaint*, 408 Mich. at 609, 292 N.W.2d at 890 (emphasis in original). The *Toussaint* court's resolution of that issue was that an employment contract for an indefinite term need not be terminable at will, and is not terminable at will where the employer has agreed to terminate the employment only for cause. Implicit in this, as *Renny* makes clear, is that employment can be made terminable at will by a contract expressly declaring that it *shall* be terminable at will. *Renny*, 427 Mich. at 418, 398 N.W.2d at 329. *Accord, Pratt v. Brown Machine Co.*, 855 F.2d 1225 (6th Cir.1988) (on account of handbook's express at-will language, rules in handbook listing acts that could result in discharge did not give rise to just-cause contract); *cf. Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986) (listing of causes that "may" result in termination of employment did not provide reasonable basis for concluding that plaintiffs were employed under just-

cause contract). But see the intermediate court decision in *Dalton v. Herbruck Egg Sales Co.*, 164 Mich.App. 543, 417 N.W.2d 496, 497 (1987) (handbook detailing progressive levels of discipline leading up to termination gave rise to jury question concerning existence of just-cause contract despite handbook provision that "[b]oth the employee and the Herbrucks have the right to terminate the employment arrangement at any time ... without specific cause or reason").

*Toussaint* and *Renny* bar discharge at will only where the employer has failed to retain the right to discharge at will, and has led the employee to believe that he or she will be discharged only for cause. That is not this case. To defeat Carrier's motion for summary judgment, Mr. Nora had to present a triable issue of fact as to his claim that the discharge was wrongful. *Loftis v. G.T. Prod., Inc.*, 167 Mich.App. 787, 795, 423 N.W.2d 358, 362 (1988). This he could not do. His intentional breach of contract claim therefore failed as a matter of law. The purported contractual right being nonexistent, Mr. Nora's claim for negligent performance of the contract failed also. The two claims stand or fall together, and in this case they fall.

The final paragraph of the contract, it will be recalled, said "[t]his agreement cannot be changed, nor any provisions thereof waived, except by mutual consent in writing." Mr. Nora failed to show mutual consent to any change in the employment agreement or any waiver of its provisions; the district court therefore acted correctly, we believe, in enforcing the contract in accordance with its terms.

■ Even if this had been a "just cause" contract, finally, Mr. Nora's discharge would still not have been actionable. Under Michigan law, a discharge arising out of an economically mandated reduction in force does not constitute a violation of a just-cause employment contract. *Boynton v. TRW, Inc., supra,* 858 F.2d 1178.

The judgment of the district court is AFFIRMED.