246 N.J. Super. 245 (1991)
587 A.2d 290
SIGMUND B. FRIED, PLAINTIFF-RESPONDENT, CROSS-APPELLANT,
v.
AFTEC, INC., A CORPORATION, DEFENDANT-APPELLANT, CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 14, 1991.
Decided February 25, 1991.
*247 Before Judges J.H. COLEMAN, DREIER and ASHBEY.
David I. Fox argued the cause for appellant (Fox & Fox, attorneys, David I. Fox, of counsel and on the brief).
Robert J. Sussman argued the cause for respondent-cross-appellant (Robert J. Sussman, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
The parties have cross-appealed from a judgment entered on a jury verdict and from various orders entered by the trial judge. Defendant, Aftec Inc., is the former employer of plaintiff, Sigmund B. Fried. Fried served as defendant's vice president of sales and marketing under a written employment agreement. Plaintiff contended that he was illegally denied a termination bonus of $75,000 per year, equal to his $75,000 per year salary, for the 18 months he was employed by defendant. Defendant appeals not only from the court's award of this bonus, but also from the dismissal of its substantial counterclaims for losses allegedly occasioned by plaintiff's failure to perform his contract. Plaintiff's cross-appeal challenges the trial court's refusal to award prejudgment interest on the molded $112,500 verdict entered after the judge accepted the jury's liability finding, but rejected its $20,000 award. We do not pass upon plaintiff's cross-appeal, since we here determine that a new trial is required on all issues.
Defendant is a computer software company founded in 1978 by its three principals, John Foss, Edward Murphy, and Anna Edson. In the summer of 1985, after seeing an advertisement in the Wall Street Journal, plaintiff began to negotiate an employment agreement with defendant. He was offered a $75,000 per year salary and a 25% stock option. In order for *248 plaintiff to receive the stock, sales had to increase significantly and the company's principals had to agree that plaintiff's personality and performance were sufficiently satisfactory (to them) for him to be accepted, in effect, as a full partner. Plaintiff testified that the sales requirements appeared so unrealistic that he also negotiated a cash bonus to be paid even if defendant's sales requirements were not met.
The agreement, principally prepared by Mr. Foss for the Corporation, specified in paragraph seven the various conditions for plaintiff's receipt of the stock, namely plaintiff's acceptance by the other principals, an increase in profitability reflected by a sales figure in the six months prior to the second anniversary of the contract at a $6,000,000 annual sales rate, and plaintiff's acceptance of the obligations of a principal by adding his guaranty to those of the other principals on outstanding corporate loans.
Since, however, plaintiff was terminated six months prior to the second anniversary date,[1] it is the alternative payment provisions of paragraph eight of the contract that are in issue here. Paragraph eight reads as follows:
If you leave Aftec for any reason prior to the anniversary, and you do not acquire stock in the company loans, you will receive a cash bonus equal to your annual salary for each year that annual sales for Aftec increased profitably. Termination for cause shall result in immediate dismissal without bonus or further claim for compensation. [Emphasis added].
After being hired on August 12, 1985, plaintiff's responsibilities included all aspects of sales, from direct contact with customers, to the hiring, training and managing of the sales *249 force, and even the development of marketing plans. According to him, notwithstanding his impressive sales record, Foss berated and belittled him on minor points within earshot of plaintiff's co-workers and repeatedly interfered with his decisions.
According to plaintiff, he had served in his capacity as vice president of sales and marketing for slightly over a year, when in September 1986 Foss hired another employee to take over a portion of plaintiff's marketing responsibilities, leaving plaintiff free to concentrate on sales. Within five months, however, and after plaintiff's responsibilities were reduced even further, this new employee also entered the sales area. Plaintiff allegedly saw that the $6,000,000 sales requirement would not be attainable, because Foss had fired all of the sales associates plaintiff had hired, and third-party vendors who sold defendant's software with their computer hardware then refused to sell the product due to the lack of technical support. Seeing the deteriorating condition around him, plaintiff quit his job on February 5, 1987. He was paid in full to that date, but when he approached Foss in March 1987 concerning the bonus, plaintiff was rebuffed.
At trial, plaintiff asserted that he met the profitability and sales increase requirements of paragraph eight of the contract, and supported this claim with the corporation's accrual-based financial statements showing sales increasing from $927,162 in 1984 (before plaintiff was hired), to $1,898,699 in 1985 and to $2,362,405 in 1986. Net earnings allegedly rose from $34,807 in 1984 to $86,352 in 1985 and to $113,438 in 1986. Defendant, however, claimed that these were accrual statements prepared for financial institutions and were not used in the operation of the firm. Defendant asserted that the corporate tax returns prepared on a cash basis were defendant's actual financial statements. Plaintiff's expert disputed this fact and asserted that the accrual statements provided an accurate picture of defendant's financial condition.
*250 Defendant's proof consisted of testimony of the principals concerning plaintiff's failure to perform in an acceptable manner; testimony of plaintiff's former employer showing that plaintiff had falsified statements in his resume concerning his qualifications, experience and performance; and testimony by the corporate accountant demonstrating that the business actually generated a cash deficiency for the periods in question. To support its counterclaim, defendant's principals testified inter alia to plaintiff's failure to learn about defendant's products, his failure to provide accurate sales projections (causing serious cash flow problems), plaintiff's giving away of a shop-floor computer program valued at $15,000 to a customer where such action was not necessary to close the deal, and plaintiff's major unauthorized trade concessions to a large customer, Aerojet, after the sale had already been booked, (reducing profits by tens of thousands of dollars).[2]
The accountant also reconstructed the financial statements to cover the specific periods of plaintiff's employment. The resultant figures showed a net loss to the company prior to plaintiff's employment (August 12, 1984 to August 11, 1985) of $6,805. For the period August 12, 1985 to August 11, 1986, plaintiff's only full year of employment, defendant was alleged to have suffered a net loss of $119,071. For the period August 12, 1986 to February 5, 1987 (just under six months), defendant asserted a loss of $77,492. Thus, defendant claims, the company saw no profits during the entire period of plaintiff's employment.[3] Defendant also contended that plaintiff was entirely *251 ineffective in building a sales organization, and in fact, had abandoned an established network of third-party vendors in favor of hiring individual salesmen, although none of the new salesmen generated any appreciable sales.
The corporate principals also testified that plaintiff had made grandiose sales projections upon which defendant based its financial commitments, forcing the principals to infuse additional capital to offset the negative cash flow. They claimed to have expressed this displeasure with plaintiff on occasion, specifically citing his semi-annual review in September 1986, at which time Foss indicated to plaintiff that defendant intended to terminate his employment because of unsatisfactory performance. Defendant asserts that it was only plaintiff's pleading which caused the principals to provide a lesser role for plaintiff within the organization. The marketing responsibilities were assigned to a new employee; plaintiff no longer would be a director of the company; he no longer would be eligible for the stock option or cash bonus; and his compensation package was significantly restructured. As a face-saving device, plaintiff was permitted to retain a title of vice president of sales. Later, after further specific deficiencies were brought to the principals' attention, plaintiff's title was again reduced to *252 a ceremonial title of vice president, strategic sales. These changes were memorialized in a memo to plaintiff dated November 5, 1986. He was to be merely a "senior salesman," with a "new compensation plan" of "base salary plus commissions with protection for [his] current earning level for a to be agreed upon period." By February 1987, it was determined to terminate plaintiff's employment for cause, and a memorandum to that effect dated February 5, 1987 so specified. The reasons were noted as having been reviewed in a face-to-face meeting.
The jury was thus faced with sharply conflicting factual issues when it found that plaintiff had established some basis for liability, but returned only a $20,000 verdict. On this appeal, defendant claims that at the very most the $20,000 verdict was sustainable, but as the trial judge's charge was clearly erroneous, even that verdict should not stand.[4] Certainly, defendant asserts, the trial judge had no basis to mold the $20,000 verdict into a judgment for $112,500. The central issue raised by defendant, however, is that the judge failed to charge the jury properly concerning the concept of "termination for cause." Lastly, defendant contends that the elements of its counterclaim were sufficiently proven such that they should not have been dismissed.[5]
*253 The trial judge accepted plaintiff's requested charge on the issue of termination for cause. The jury was merely told that if the sales for defendant increased profitably for each year plaintiff was there "and if you find that he was not terminated for cause as the parties agreed cause to be," then plaintiff would be entitled to "receive a cash bonus equal to his annual salary for each year during his employment that the annual sales of Aftec increased profitably." Defendant, however, sought an instruction explaining the "usual common-law meaning of termination for cause."
The jury was obviously confused concerning this issue. In its first question to the court during deliberations, it inquired:
We would like a more detailed explanation on the termination for cause based on New Jersey law.
QUESTION: Are we bound to the understanding of termination for cause means based on the testimony of plaintiff and defense only?
In a colloquy with attorneys the court stated:
You have two vastly disparate understandings of this phrase. Plaintiff says for cause means some immoral activity, some illegal activity or some addiction to a chemical. The defendant says those things plus incompetence, failure to do the work. The defendant is right as the term is normally used. The defendant is consistent with the most frequent use of that term, I should say, but the jury has to decide what the parties intended.
The court then responded to the jury, stating that the issue must be decided "from the evidence at trial, what the parties intended to mean and what the parties meant by termination for cause."
When the jury returned the $20,000 verdict, the trial judge decided to explore the basis for the jury's decision in the event it was necessary to mold the verdict. Over defendant's objection the jury foreman responded that the verdict "was based upon what we felt was fair and equitable." In response to another question the foreman acknowledged that the verdict came from the jury's "own notion of fair play given the evidence [it] heard on both sides." The foreman also informed the court that the jury wanted to honor the contract and felt that it was bound to give plaintiff a bonus, thus, it gave him *254 less than the amount called for in the contract, since plaintiff's performance was not worth recognition for the full amount. It did not say, however, whether plaintiff had been dismissed for cause, and if so, when. Nor did it specify whether its partial judgment was tied to plaintiff's reduction in job specifications during his 18-month period of employment. While the parties each claim that its version of the profitability figures was correct, that issue was clearly before the jury. Had a time period been specified by the jury relating to its $20,000 award, the verdict could possibly have been sustainable, but we cannot relate this finding to any ascertainable period.
Central to this appeal is the meaning of "termination for cause," since plaintiff's bonus was dependent upon his not having been so terminated. Plaintiff's assertion of a special meaning for this term was conditioned upon the jury's acceptance of his testimony that the matter had been discussed and the language inserted agreed upon to include only the commission of a crime, actions indicating moral turpitude, etc. The trial judge, however, failed to charge concerning the standard the jury should apply if it did not believe that there had been such special understanding. See Evid.R. 8(2). We agree that the trial judge should have left the construction of the term "good cause" to the jury, since the meaning of the term was uncertain or ambiguous and depended upon parol evidence. Michaels v. Brookchester, Inc., 26 N.J. 379, 387, 140 A.2d 199 (1958). Yet if the jury determined that no special meaning had been agreed upon, the charge should have provided guidance.
Although there are several cases in New Jersey that refer to termination of a private employment contract "for cause," see e.g., Woolley v. Hoffman-LaRoche, Inc., 99 N.J. 284, 287, 491 A.2d 1257 (1985); Alter v. Resorts Int'l, Inc., 234 N.J. Super. 409, 416, 560 A.2d 1290 (Ch.Div. 1989); Savarese v. Pyrene Mfg. Co., 9 N.J. 595, 601, 89 A.2d 237 (1952), quoting Eilen v. Tappin's, Inc., 16 N.J. Super. 53, 56, 83 A.2d 817 (Law Div. 1951), none have defined the term in the absence of some special understanding. Other cases have defined "cause" within *255 the context of the loss of a professional license, In re Berardi, 23 N.J. 485, 492-493, 129 A.2d 705 (1957), aff'g Berardi v. Rutter, 42 N.J. Super. 39, 47, 125 A.2d 877 (App.Div. 1956); or the termination of public employment, Golaine v. Cardinale, 142 N.J. Super. 385, 396-397, 361 A.2d 593 (Law Div. 1976), aff'd o.b. 163 N.J. Super. 453, 395 A.2d 218 (App.Div. 1978), certif. den. 79 N.J. 497, 401 A.2d 252 (1979).
As Judge Pressler explained in Golaine, the concept is an amorphous one which can be applied only after viewing the responsibilities of the public employee. It "need not necessarily involve either commission of a crime or an improper purpose." 142 N.J. Super. at 397, 361 A.2d 593. The act, however, "must be itself an act of misfeasance or nonfeasance, and must be, further, an act which in view of the duties and obligations of the officer, substantially disadvantages the public." Id. at 398, 361 A.2d 593. Although there is no New Jersey authority on this point, it is clear that similar principles apply in the private sector, but substituting the private employer's interests for that of the public in Golaine. See e.g., Alonso v. Hospital Auth. of Henry County, 175 Ga. App. 198, 332 S.E.2d 884, 887 (Ga. App. 1985); Work v. Mt. Abraham Union High School Bd., 143 Vt. 94, 483 A.2d 258, 259-260 (Vt. 1984); Roach v. Consol. Forwarding Co., 665 S.W.2d 675, 680 (Mo. App. 1984). Farrakhan v. Sears, Roebuck & Co., 511 F. Supp. 893, 903-905 (D.Neb. 1980); Dawson v. Clark, 145 Colo. 278, 358 P.2d 591, 592 (1961); Crisler v. Illinois Cent. RR Co., 196 F.2d 941, 942-944 (5th Cir.1952). And see 51 C.J.S. Labor Relations § 254 (1967). The C.J.S. definition notes that "the phrase creates an objective, rather than a personal, subjective test ...," and most of the cited cases note that the concept precludes discharge for mere whim or caprice. See e.g., Roach v. Consol. Forwarding Co., 665 S.W.2d at 680, where the court endorsed the trial judge's instruction to the jury defining "just cause" as
a real cause or basis for dismissal as distinguished from an arbitrary whim or caprice  that is, a cause or ground that a reasonable employer, acting in good *256 faith under the collective bargaining agreement in question, would regard as a good and sufficient reason for terminating the services of an employee.
Id. at 679 n. 2. Quoting from texts, the court further noted that the phrase includes a growing body of common law, encompassing concepts such as "honesty, punctuality, sobriety, or conversely, the right to discharge for theft, repeated absence or lateness, destruction of company property, brawling and the like." Id. at 680. Furthermore, a firing for just cause must bear relationship to and focus on the ability and fitness of the employee to discharge the duties of his or her position. Alonso v. Hospital Auth. of Henry County, 332 S.E.2d at 887. There, the plaintiff, defendant's chief pathologist, refused to enter into an agreement with defendant to let the hospital receive the maximum medicaid/medicare reimbursement, costing the hospital approximately $25,000 over a six-month period. The trial judge, applying an objective standard, had determined that this conduct constituted good cause for dismissal, and the appellate court concurred.
Relating these principles to the case at hand, if the jury determined that no special definition of "cause" had been agreed upon by the parties, plaintiff could not have lost his bonus rights based upon the corporate principals' general subjective dislike or disapproval of plaintiff. If, however, defendant had substantial objective proof of plaintiff's failure to perform his duties, plaintiff was subject to termination for cause, notwithstanding that there had been no proof of dishonesty or the like. A non-specific dissatisfaction would not have sufficed, nor would a minor failure to produce a particular sale or the granting of a minor extra fringe benefit to a customer. Here, given the nature of the contract under review and the fact that plaintiff was to receive a substantial benefit if a particular sales figure was reached, the failure to reach the figure alone could not be "cause" for the termination, since the agreement contemplated that plaintiff may or may not reach that goal, and only provided the extra stock incentive if he did. Since all that was needed for plaintiff's bonus was that there be *257 some increase in sales and profit to the corporation, he could not be discharged, if these conditions were met, merely to save the corporation the bonus money. Although much was made of plaintiff's alleged misrepresentations in his employment application, he apparently was not discharged for fraud.[6]
The court should have instructed that if the jury found the parties had not given a special meaning to the words "good cause," it should have considered plaintiff's performance of his assigned duties and defendant's reasons for firing him (as articulated at the time), and then determined whether defendant acting as a reasonable employer and in good faith could properly have regarded these reasons for firing as a good and sufficient basis for terminating plaintiff's services. See Roach v. Consol. Forwarding Co., 665 S.W.2d at 679.
The jury further should have been instructed concerning the period for which the bonus might be payable. If during the 18-month employment period plaintiff had voluntarily accepted a lower position and thus had relinquished his rights to a bonus in consideration for being retained by the company, then his waiver could be given effect. Alternatively, if there had been no such waiver, the jury could have considered whether the contract by implication gave plaintiff the right to a bonus only through such date as he held the higher office for which the bonus was a contractual benefit.
The court's molding of the verdict overlooked a salient factor. The jury responded affirmatively to the first interrogatory question: "Did the plaintiff comply with the subject contract so as to qualify for a cash bonus?" The court accepted this answer as a finding that plaintiff was entitled to a bonus for the full 18-month period. By the jury's $20,000 response to the second (damage) question, there was at least a strong indication *258 that the jury considered plaintiff to be entitled to a bonus only for some restricted portion of his tenure. The jury did not specifically relate the $20,000 damage figure to any particular period; but neither did it even state unequivocally that liability was established for any particular period. The foreman's statement revealed more of a whim than an assessment of a limited period of entitlement. The trial judge's assumption that the full 18-month period was encompassed in the jury's answer to the first interrogatory was unwarranted, and thus the judge incorrectly determined to mold the verdict to $112,500. Since we have determined that the jury was not charged properly concerning the questions of "good cause," nor did it relate its verdict to any shortened period of payment, we need not treat in detail defendant's remaining points on appeal, other than the possible reinstatement of its counterclaim.
Defendant's various witnesses allege that plaintiff, in breach of his contractual duties so injured the corporation that it was entitled to damages on its counterclaim. Five counts of the counterclaim remained after defendant withdrew four additional counts. The first count of the counterclaim basically asserts a breach of contract. This count was properly dismissed.[7]
Although goals for payment of bonuses and stock were established in the contract, a contract for commercial employment requires nothing more than reasonable diligence ("standard care") on behalf of the employee to perform its terms. See Restatement (Second) of Agency § 379(1) (1958). Absent a special agreement, an employee whose best efforts resulted in poor performance, causing a loss of profits, does not become liable for such losses in a breach of contract action. An employer cannot give an employee negative fitness reports, retain the employee, and later sue him for failure to perform *259 the agreement or for overall negligence or carelessness, allegedly causing the company financial losses. Cf. Carmichael v. Lavengood, 112 Ind. App. 144, 44 N.E.2d 177, 180 (Ind. App. 1942). The court there stated that
in the absence of an express agreement by which the agent expressly agrees to be so bound, the agent is not an insurer of the success of his undertaking and he does not guarantee his principal against incidental losses, and if he acts with good faith and with due care he is not liable for losses which result from a mere mistake.
And see United States Liability Ins. Co. v. Haidinger-Hayes, Inc., 1 Cal.3d 586, 83 Cal. Rptr. 418, 463 P.2d 770, 774 (1970). The employer's remedy is to fire the employee for ineptness or lack of diligence. At most, an affirmative remedy for breach of contract or negligence exists where there is "misconduct in negotiations with third persons," harm to "tangible things in the [agent's] custody," or "causing the principal to be subject to liability for a tort crime, or breach of contract." Restatement (Second) of Agency § 379(1) comment b (1956).
While we have found no New Jersey cases directly in point relating to responsibility for corporate losses, the foregoing principles appear self-evident. Even the Restatement rule may be too stringent as it applies to negligent losses of property in New Jersey. New Jersey apparently follows the New York rule in not permitting an employer to seek indemnity from an employee for acts of negligence causing the employer losses. Rather, the employer usually indemnifies the employee. Eule v. Eule Motor Sales, 34 N.J. 537, 540-541, 170 A.2d 241 (1961). There the Court stated:
The theoretical liability of an employee to reimburse the employer is quite anachronistic. The rule would surprise the modern employer no less than his employee. Both expect the employer to save harmless the employee rather than the other way round, the employer routinely purchasing insurance which protects the employee as well. Except for the rare case in which the liability of the employee may serve as a stepping stone to reach someone else.... the prospect of a claim for indemnity is only of academic significance.... We should remember we are dealing with negligence which often is but a matter of split-second inadvertence. The concentration of people and machines means *260 inevitably a substantial and predictable incidence of negligent injury. The employee can hardly carry that burden.[8]
The second count of the counterclaim stands on a firmer basis. Following plaintiff's firing, defendant allegedly discovered that plaintiff's employment application had been fraudulent. Defendant's fraud claim was supported not only by its own principals' testimony, but that of plaintiff's former employer. As plaintiff's alleged fraud might have caused him to have been given greater responsibility than he could handle, resulting in inadequate performance, this count should not have been stricken. As noted in Restatement (Second) of Agency § 379(1), an employee must also "exercise any special skill that he has." Therefore, insofar as defendant asserted that plaintiff materially misrepresented his background, training or skills which defendant expected him to apply to the job, the counterclaim stated an actionable claim. See also Restatement (Second) of Agency § 279(1) comment c (1956). The third count, although framed in warranty language, virtually duplicates the second count but relates specifically to plaintiff's skills. This count also should have withstood the motion to dismiss. The fifth count of the counterclaim also parallels the second and third and should not have been stricken. Though these counts would remain if the case is to be retried, defendant must be prepared to prove that this alleged fraud proximately caused its asserted losses.
In sum, we reverse the trial judge's molding of the verdict as well as the original judgment based upon the jury's verdict. We also reverse the striking of counts two, three and five of *261 the counterclaim. We remand the matter to the Law Division for a new trial, unless defendant is willing to accept the original verdict in lieu of the new trial.
NOTES
[1] Prior to plaintiff's firing, he was twice demoted within the corporate structure to levels that defendant contended carried with them no right to either the stock or the payment in lieu thereof. Defendant asserts that by plaintiff's voluntarily accepting these lower positions, he implicitly waived the original benefits. As will be discussed infra, if the jury accepted this theory, it may have terminated plaintiff's rights to any bonus at a date other than his firing. Our inability to equate any period of plaintiff's compliance with the contract to the limited jury award, makes it impossible for us to sustain the liability verdict and make a meaningful remand on the issue of damages alone.
[2] This transaction was specifically pointed to by defendant as showing that even the cash method of accounting overstated corporate profits in that the Aerojet profits were taken in 1986, although the substantial concessions granted by plaintiff would not affect the profits until 1987.
[3] An evidence point was raised concerning the use of a chart showing the figures to which testimony had been given. In this appeal defendant contends that the chart was erroneously excluded. Defendant offered the chart in evidence, but plaintiff successfully objected, since the chart had not been supplied to plaintiff in discovery. Under Evid.R. 70(1)(g), defendant was entitled to introduce a summary of the financial data that was brought to court by its accountant, provided the records were present in court for use in cross-examination. See Associated Metals & Minerals Corp. v. Dixon Chemical & Research Inc., 82 N.J. Super. 281, 307-310, 197 A.2d 569 (App.Div. 1964), certif. denied 42 N.J. 501, 201 A.2d 580 (1964) (predating the New Jersey Rules of Evidence). Furthermore, this evidence was merely a visual representation of the expert's opinion, gleaned from his inspection of the books and records. The trial judge may well have determined to exclude the exhibit under Evid.R. 4, since the matters contained therein had already been the subject of testimony. However, the visual representation might have been an aid to the jury unless the trial judge, from his unique perspective at the trial, determined that it would have over-emphasized the particular witness's testimony if admitted into evidence. This determination is discretionary with the trial judge. If there is a retrial and if the exhibit is again offered, the judge should redetermine the issue based upon the facts before him.
[4] It is possible to read defendant's brief as only requesting a reinstatement of the $20,000 verdict. The errors discussed in this opinion only relate to the court's refusal to define "termination for cause," its acceptance of plaintiff's charge on the subject, and the resultant problem of the jury's failure to relate its damage award to a specific time period. Therefore, if defendant on remand does not seek a new trial on these issues and its counterclaim, but is willing to abide by the original verdict (with the pre-judgment interest originally ordered), a new trial is not necessary. We are not blind to litigation costs, and will not order a new trial when a lesser remedy might suffice. If such a result is acceptable to defendant, we would merely order that the court's additur order be set aside.
[5] An additional point raised in defendant's brief challenged the court's instructions to the jury concerning the preparation of the letter agreement and the fact that it should be construed against the company. We see no error in this portion of the charge.
[6] While, as noted infra, a substantial misrepresentation of plaintiff's qualifications might be relevant to the counterclaim or even to substantiate defendant's claim that plaintiff was unable to perform the contract properly, the alleged misrepresentations were not advanced as the "cause" for his firing.
[7] The fourth count parallels the first count, but is based upon negligence or carelessness. It must be similarly treated.
[8] The responsibility of the employees in Male v. Acme Markets, Inc., 110 N.J. Super. 9, 12, 264 A.2d 245 (App.Div. 1970), for losses in their cash drawers might be thought to be contrary to Eule. But there the liability was tied directly to each employee's actions with the overtone of dishonesty rather than negligence. Since only the employee had access to the cash drawer, any shortage was attributable to the employees "negligence or defalcation." No New Jersey case sustains the view that the inept employee is responsible for general lost corporate profits.