818 A.2d 345

LARRY HEINZERLING, ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF SIEGLINDE HEINZERLING, DECEASED; AND LARRY HEINZERLING, INDIVIDUALLY, PLAINTIFFS, v. DAVID GOLDFARB, D.O.; WILLIAM GREEN, M.D.; PRINCETON RADIOLOGY ASSOCIATES, P.A., DEFENDANTS.

Superior Court of New Jersey
Law Division Mercer County

Decided May 9, 2002.

*Gerald R. Stockman,* for Plaintiffs (*Stockman & Mikulski, L.L.C.,* Attorneys).

*Gregory J. Giordano,* for Defendant, William M. Green, M.D. (*Lenox, Socey, Wilgus, Formidoni, Brown, Giordano & Casey, L.L.C.,* Attorneys).

*Tess Kline,* for Defendant Princeton Radiology Associates (*Buckley & Theroux,* Attorneys).

*Michael E. Sullivan,* for Defendant David Goldfarb, D.O. (*Leyhane & Cunningham,* Attorneys).

SABATINO, J.S.C.

Defendants in this medical malpractice case have moved *in limine* to bar the testimony of a registered nurse retained by plaintiff as a trial witness. Plaintiff's desired presentation of the nurse's testimony raises novel issues under *Evid. R.* 1006 and other provisions of the New Jersey Evidence Rules.

I.

Sieglinde Heinzerling was diagnosed with lung cancer on May 13, 1997. She died on March 10, 1998. Her estate, as plaintiff in this action, contends that the defendant medical providers deviated from the applicable standards of care by failing, among other things, to diagnose Mrs. Heinzerling's condition sooner.

Plaintiff seeks to call Audrey Berry, MSN, RN, as a witness at trial. Ms. Berry is a registered nurse, with nearly twenty years of experience in her field as a practitioner and as an instructor. Nurse Berry was not personally involved in Mrs. Heinzerling's care. Nor has the nurse been retained as an expert witness on deviation. Instead, counsel wishes to have Nurse Berry assist the jury in the damages phase of the trial. In particular, plaintiff intends to have Nurse Berry extract information from Mrs. Heinzerling's copious medical records and explain to the jury, in more understandable terms, the decedent's symptoms and the cancer

treatments and medications administered to her in the last ten months of her life.

The court finds that Nurse Berry has substantial credentials. She received a Bachelors of Science degree in Nursing from the State University of New York at Binghamton in 1983 and a Masters Degree in Community Health Nursing in 1986 from the University of Pennsylvania. Her training included two clinical internships, one focusing on in-home care for the chronically ill and the other involving the treatment of patients with urinary incontinence. She served three years as a staff nurse at the University of Pennsylvania Hospital, six years as a visiting nurse caring for homebound Medicare patients with the Roxborough Memorial Hospital, and another year rendering private hospice care in Bucks County, Pennsylvania.

The record shows that much of Nurse Berry's career has been devoted to teaching and research. She has been a nursing instructor at the Presbyterian Medical Center of Philadelphia (1988–90), the College of New Jersey (1995–96), and Thomas Jefferson University in Philadelphia (1996–98). She served as Director of the Perry Continence Center for the Bryn Mawr Biofeedback Institute (1986–87). She has published four research abstracts and has given presentations at ten professional conferences held in various states. Since 1998 Nurse Berry has been employed with Thomas Jefferson's Division of Medical Oncology as a specialist in behavioral epidemiology. Her focus has been on cancer prevention and cancer control intervention studies, research funded with grants from the National Institute of Health and the National Cancer Institute.

As noted above, Nurse Berry has been retained by plaintiff's counsel to review and summarize Mrs. Heinzerling's medical records compiled from the diagnosis of her cancer on May 13, 1997 through her death on March 10, 1998. During that time the decedent underwent numerous rounds of radiation and chemotherapy treatments, and was administered a host of medications.

Nurse Berry initially reviewed records for the plaintiff compiled in a three-ring looseleaf binder approximately four inches wide (Exh. D–5). The records were compiled from no less than sixteen physicians who were involved in plaintiff's care and treatment. The records principally are those of plaintiff's primary care physician, Michael Roberts, M.D., her chief oncologist, Doreen Babott, M.D., and two associates of Dr. Babott, David Sokol, M.D., and Joel Dietz, M.D. From those materials, Nurse Berry extracted a subset of the records, which were placed in a smaller three-ring binder (Exh. D–4).

The court finds that the records reviewed by Nurse Berry are extensive and highly technical. By this court's count, the documents in Exhibit D–4, the condensed version of the records, cover some fifty-three (53) pages. The records were estimated at Nurse Berry's deposition to be approximately five to nine centimeters thick. The records include entries on at least sixty-six (66) dates, chronicling the intensive cancer treatment that plaintiff received almost daily over the course of ten months. Some of the records are typed. Others are handwritten, with a variety of symbols and shorthand notations typical of medical charts.

The court finds that the records in question are replete with technical medical jargon. The records would not be readily understood by lay jurors without substantial definition and explanation. If the records were admitted as exhibits at trial without explanatory testimony, they would be apt to cause serious confusion in the jury room.

Nurse Berry initially prepared an eight-page summary of the records that she reviewed. Nurse Berry thereafter revised the summary in a document substantially similar to her initial version. The nurse's summary communicates, in chronological and understandable fashion, the course of plaintiff's treatment for cancer from May 1997 through March 1998. The summary extracts information from the original records about the treatments that plaintiff received, the medications that were prescribed, the diagnostic tests that were performed, and the symptoms that plaintiff

experienced. At various times it translates technical medical terms appearing in the original records, such as "hemoptysis", "leukopenia", "ansculating", "edema" and "dyspnea."

Nurse Berry also explains the therapeutic purposes of several of the numerous medications administered to plaintiff as part of her oncology care. She also explains the significance of symbols appearing in the physicians' handwritten notes on plaintiff's charts; for example, explaining that a doctor's handwritten upward arrow generally is meant to signify an increase in a rate or other finding.

After plaintiff's counsel supplied Nurse Berry's summaries in discovery, defense counsel took the nurse's deposition. The deposition probed into the manner in which the nurse had prepared her work product. The court has reviewed that deposition transcript in detail, as well as Nurse Berry's two written summaries and the original source documents upon which they were based.

Defendants have objected to Nurse Berry's proposed testimony on various grounds. They argue that Nurse Berry cannot serve as a fact witness under *Evid. R.* 602 because she has no personal knowledge of the plaintiff's care and treatment. Lacking a foundation of such personal knowledge, the nurse allegedly cannot offer lay opinion under *Evid. R.* 701. Defendants further argue that Nurse Berry cannot function as an expert at trial in any manner because she is not a physician. Furthermore, the nurse has not opined on standards of care, causation or other malpractice liability issues. Additionally, defendants characterize Nurse Berry's testimony as unfairly prejudicial and thus subject to exclusion under the balancing test of *Evid. R.* 403.

After hearing oral argument, this Court invited the parties to file supplemental briefs on whether Nurse Berry's testimony might qualify as an admissible summary under *Evid. R.* 1006 or related evidentiary principles. The court has now considered those submissions and further oral argument.

■ There are at least three kinds of evidentiary summaries that may be presented in a courtroom.

First, there are "primary-evidence summaries" that are typically used to condense voluminous materials that cannot be conveniently examined in court. *United States v. Bray*, 139 *F*.3d 1104, 1112 (6th Cir.1998); see also 1 Devitt, *Federal Jury Practice and Instructions* § 14.02 (4th ed.1992). See also *Fed.R.Evid.* 1006 and *N.J. Evid. R.* 1006.

■ Second, there are "pedagogical-device summaries", more commonly described as "demonstrative aids", which are presented to summarize, clarify or simplify proofs admitted in the case. These devices, such as chalkboard drawings, graphs, charts, calculations, or models, are not themselves admitted into evidence, but instead used "as an aid to the presentation and understanding of the evidence." *United States v. Bray, supra*, 139 *F*.3d at 1112; 1 Devitt, *supra*, at § 14.02. See also *White Industries v. Cessna Aircraft Co.*, 611 *F.Supp.* 1049, 1069 (W.D.Mo.1985) (distinguishing between "pedagogical" demonstrative aids that undertake to "summarize or organize other evidence" and *Rule* 1006 summaries offered in lieu of the supporting materials).

■ Third, a trial advocate may present "secondary-evidence summaries." These are hybrids of the first two categories, admitted "not in lieu of the evidence they summarize but in addition thereto." *United States v. Bray, supra*, 139 *F*.3d at 1112 (italics in original); see also *United States v. Citron*, 783 *F*.2d 307, 317 n. 10 (2d Cir.1986). Secondary-evidence summaries are permitted where, "in the judgment of the trial court such summaries so accurately and reliably summarize complex or difficult evidence...as to materially assist the jurors in better understanding the evidence." *United States v. Bray, supra*, 139 *F*.3d at 1112. Such devices are "not prepared entirely in compliance with Rule 1006 and yet are more than mere pedagogical devices." *Id.*

Nurse Berry's proposed testimony should be analyzed under the first and last of these evidential categories, i.e., either as a

primary-evidence summary under *Evid. R.* 1006 admitted in lieu of Mrs. Heinzerling's post-diagnosis medical records or as a secondary-evidence summary designed to accompany the admission of those proofs.

New Jersey *Evidence Rule* 1006, adopted in 1992, almost entirely tracks the language of *Federal Evidence Rule* 1006. The New Jersey version reads as follows:

> The contents of voluminous writings or photographs which cannot be conveniently examined in court may be presented by a qualified witness in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The judge may order that they be produced in court [*N.J. Evid. R.* 1006].

The only difference between *N.J. Evid. R.* 1006 and its federal counterpart is that our local version adds the requirement that the summary be presented by a "qualified witness." That latter requirement retains an aspect of former *N.J. Evid. R.* 70(1)(g)[1], the 1967 provision that was superseded in 1992 with the recodification of our state's evidence laws. See 1991 Supreme Court Committee Comment to *Evid. R.* 1006, quoted in Biunno, *N.J. Evidence Rules* 969 (2002 ed.).

An evidential summary may be presented in the form of a written document or, as sought here by plaintiff, in the form of live testimony. See C. Mueller & L. Kirkpatrick, *Evidence,* § 10.16 at 1232 ("FRE 1006 authorizes the admission of written *or testimonial* summaries, as well as charts and calculations") (emphasis supplied). For example, in *Colorado Coal Furnace Dis-*

---

[1] Former *Evid. R.* 70(1)(g) read: "As evidence to prove the content of a writing, no evidence other than the original writing itself is admissible, unless... (g) a calculation or summary of contents is called for as the result of an examination by a qualified witness of multiple or voluminous writings which cannot conveniently be examined in court, provided that such writings are present in court for use in cross-examination, or the adverse party has waived their production, or the judge finds that their production is unnecessary[.]" The state's adoption of *Evid. R.* 1006 also eliminated *Rule* 70(1)(g)'s mandate that the original documents be produced in court, now only requiring production at "a reasonable time and place."

*trib., Inc. v. Prill Mfg. Co.,* 605 *F.*2d 499, 505 (10th Cir.1979), the federal appeals court upheld the admission at trial of "summary testimony" of various corporate books and records to support plaintiff's lost-profits claim in a breach of contract case. The court ruled that the testimony was proper, even though the actual books and records had not been presented at trial, because adversary counsel had access to the same underlying records and information. *Id.* Likewise, in *Nichols v. Upjohn Co.,* 610 *F.2d* 293 (5th Cir.1980), the Fifth Circuit upheld the admission of testimony at a products liability trial which had summarized investigative reports contained in a drug manufacturer's regulatory filing with the Food and Drug Administration. The court allowed the testimonial summary because of the voluminous nature of the filing. *Id.*[2]

■ There are no cases on point in New Jersey concerning the use of testimonial, as opposed to documentary, summaries at trial. This court finds that the parallel language of *Evid. R.* 1006 should be construed to permit such summaries in testimonial form. Live testimony often can be more readily understood and accessed by a lay jury than dry written materials. Moreover, such testimony may be more effectively impeached by an adversary than a stack of paper exhibits. Any objections to the oral form of Nurse Berry's planned testimonial summary are therefore overruled.

The text of the rule, the federal case law and evidence scholarship all make clear that a *Rule* 1006 summary is only appropriate for documents that are truly "voluminous" and cannot be "conveniently" examined in court. For instance, in *United States v. Bakker,* 925 *F.*2d 728, 736 (4th Cir.1991), the federal appeals court upheld the admission of eleven hours of taped broadcasts of the defendant's syndicated television program, which an FBI agent

---

[2] The witness in *Nichols* had summarized 300 volumes of material filed with the FDA to obtain a approval for a new drug, totaling some 94,000 pages. However, there is nothing in the court's reasoning in *Nichols,* nor in the text of *Rule* 1006, that would preclude the use of evidential summaries for voluminous writings of less-mammoth dimensions.

had pared down from over 200 hours of videotape that the agent had reviewed prior to trial. In *United States v. Gardner*, 611 *F.*2d 770 (9th Cir.1980), another circuit court upheld a prosecutor's use of a chart that had summarized extensive financial data about the defendant, specifically finding that the summary "contributed to the clarity of the presentation to the jury, avoided needless consumption of time and was a reasonable method of presenting the evidence." *Id.* at 776.

In another criminal case, *United States v. Loney*, 959 *F.*2d 1332, 1340–42 (5th Cir.1992), the appellate court upheld the government's use of a summary compilation of computer records that had contained information about seventy frequent-flyer accounts fraudulently manipulated by the defendant. Further, in *United States v. Scales*, 594 *F.*2d 558, 561–65 (6th Cir.1979), the reviewing court found no error in the admission at trial of a series of large charts summarizing facts from some of the 161 exhibits in evidence. *See also United States v. Bray, supra*, 139 *F.*3d at 1110–13 (affirming the use of charts to summarize 500 work forms for each of two postal employees, and 100 forms for each of two replacement workers).

■ As the Sixth Circuit recognized in *Scales*, "[t]here is no requirement in Rule 1006...that it be literally impossible to examine the underlying records before a summary or chart may be utilized." 594 *F.*2d at 562. Rather than imposing such a harsh standard of impossibility, "[a]ll that is required for the rule to apply is that the underlying writings be 'voluminous' and that incourt examination not be convenient." *Id.* Moreover, the summary itself, if in documentary form, need not be kept in the regular course of a business. *United States v. Loney, supra*, 959 *F.*2d at 1340–41.

■ Another important feature of a Rule 1006 summary is that it "must fairly condense the underlying material." C. Mueller & L. Kirkpatrick, *supra*, § 10.16 at p. 1236. The summary "cannot embellish with information not contained in the originals." *Id.*; see also *United States v. Drougas*, 748 *F.*2d 8, 25 (1st Cir.1984)

(summaries with information "not present" in the underlying records deemed inadmissible); *United States v. Seelig*, 622 *F*.2d 207, 213–16 (6th Cir.1980) (upholding the admission of a chart of select high-volume purchases made from defendant pharmacist, despite defendant's claim that the chart was "skewed", but reversing the use of a separate chart that had compared defendant's sales with those of eight other pharmacies).

A summary "cannot be jury argument in disguise." C. Mueller & L. Kirkpatrick, *supra*, § 10.16 at p. 1236; see also *Gomez v. Great Lakes Steel*, 803 *F*.2d 250, 257 (6th Cir.1986) (criticizing admission of a summary that was "more akin to argument than evidence"). However, the summary "need not be an 'encyclopedic' survey of all the evidence." *Id.*, quoting *United States v. Bentley*, 825 *F*.2d 1104, 1108 (7th Cir.), *cert. denied*, 484 *U.S.* 901, 108 *S.Ct.* 240, 98 *L.Ed.*2d 198 (1987) (upholding use of charts that summarized trades in silver and copper futures).

The limited reported case law in New Jersey follows these precepts. In *Associated Metals & Minerals Corp. v. Dixon Chemical & Research Inc.*, 82 *N.J.Super.* 281, 307–10, 197 *A.*2d 569 (App.Div.1963), the Appellate Division ratified the admission at trial of summaries of the plaintiff's books of account. The underlying records were in two large ledger books each measuring about four inches thick. *Id.* at 308, 197 *A.*2d 569. The summaries were prepared for trial by an employee of the plaintiff's bookkeeping department. *Id.* As Judge Goldmann observed in upholding the admission of those compilations, the rule authorizing such summaries "is one of convenience, based upon practical necessity." *Id.* at 310, 197 *A.*2d 569. Quoting from Wigmore's treatise, the Appellate Division noted:

> [I]t is obvious that it would often be out of the question to...[require] the production of the entire mass of [original] documents and entries to be perused by the jury or read aloud to them. The convenience of trials demands that other evidence be allowed to be offered, in the shape of the testimony of a competent witness who perused the entire mass and will state summarily the net result. Such a practice is well established to be proper [*Id.* at 309, 197 *A.*2d 569, quoting 4 *Wigmore on Evidence* (3d ed.1940) § 1230 at p. 434].

In another case decided prior to the adoption of N.J. *Evid. R.* 1006, the Appellate Division noted in *Fried v. Aftec, Inc.*, 246 *N.J.Super.* 245, 587 *A.*2d 290 (App.Div.1991) that a trial judge has discretion to allow the use of a summary chart of financial records discussed by an expert witness in the course of his testimony. Although the Law Division judge in *Fried* had excluded the chart because of discovery violations by its proponent, the appellate court condoned the general use of such aids to the jury unless a trial judge, "from his unique perspective at the trial," determines that its presentation over-emphasizes certain proofs. *Id.* at 251, 587 *A.*2d 290. "This determination is discretionary with the trial judge." *Id.*

The court finds that Nurse Berry's summary testimony has the potential to satisfy these conditions of *Evidence Rule* 1006. The medical records that the nurse examined are voluminous and largely technical in nature. They cannot be "conveniently" examined and understood by a lay jury unfamiliar with medical terms and notations. The underlying records also appear to be generally admissible as business records under *Evid. R.* 803(c)(6), containing a number of embedded out-of-court statements covered by the hearsay exceptions for expressions of then-existing physical and mental conditions, see *Evid. R.* 803(c)(3), and for statements made for purposes of medical diagnosis or treatment, *Evid. R.* 803(c)(4).

Further, the court finds that Nurse Berry is qualified to render a summary of the medical records. As noted above, she possesses substantial professional credentials in the health care field and in the specific care of cancerous and other chronically ill patients. Those credentials establish that the nurse has "technical or specialized knowledge [that] will assist the trier of fact to understand the evidence." *Evid. R.* 703. The nurse need not be a physician to describe, for example, the medications and treatments that the patient received, or to translate the common medical symbols appearing on the patient's charts. Also, the nurse need not offer any expert opinions in her limited trial role as a summary provid-

er. As *Rule* 703 explicitly recognizes, an expert may testify in the form of an opinion "or otherwise."

The possibility raised by defendants that plaintiff's counsel might instead call to the witness stand each of the physicians involved in his deceased client's medical care, *seriatim*, does not require the exclusion of Nurse Berry's evidential summary. Contrary to defense counsel's arguments, plaintiff is not required to present her proofs in a more elaborate fashion. Mindful of the Appellate Division's recognition in *Associated Metals*, that the operative evidence concept here is one of "practical necessity", this Court finds that a singular presentation from Nurse Berry offers an efficient and less costly alternative to presenting each doctor in turn to explain his or her portions of the records. A singular presentation is also apt to be more cogent than piecemeal accounts from each of the treating and examining physicians. Moreover, even if plaintiff or defendants choose to call those physicians at trial and admit the underlying records *in toto*, Nurse Berry's testimony may still be admitted as a secondary-evidence summary.

The equities of denying defendants' pre-emptive application to bar the nurse's testimony are enhanced by the unavailability of the decedent. Had Mrs. Heinzerling lived, she would have been able to recount at trial, albeit in lay terms, much of the information contained in her medical records. That information would be highly probative of plaintiff's damages arising from her pain, suffering and disability. She would have told the jury in her own words what she literally had gone through in her cancer therapy, week-by-week, month-by-month. That prospect, of course, does not exist in a wrongful death and survival case such as this one. The estate should not be forced to the expense of summoning each of the decedent's physicians involuntarily to court to explain the documented medical history of the decedent's last year of life. Nurse Berry offers a legitimate surrogate means to have the same information conveyed to the jury, and plaintiff should not be denied that option out of hand.

■ The court also rejects defendant's arguments that Nurse Berry's testimony is *per se* inadmissible under *Evid. R.* 403. To be sure, the subject matter of Sieglinde Heinzerling's cancerous symptoms and chemotherapy treatment is not pleasant. Nevertheless, it is very relevant to the plaintiff's damages case. Counsel for plaintiff is admonished to present the nurse's testimony in a dispassionate manner. If he fails to do so, the court will enforce suitable corrective measures, including potentially barring or striking the nurse's testimony altogether. Assuming those strictures will not be violated, the court cannot conclude in the abstract that the prejudicial impact of the nurse's testimony will substantially outweigh its probative value.

The court is by no means providing *carte blanche* authorization for the nurse to editorialize before the jury. In particular, the Court will require that Nurse Berry's actual testimony at trial be presented in a manner that is a substantially balanced and fair summary of the records. In that regard, defense counsel at deposition have identified at least three places in Nurse Berry's written summary where the nurse has omitted information from the records that had indicated some favorable developments for the decedent. In particular, the nurse's summary omitted mention of the decedent's improved breathing as documented on January 26, 1998, a report of the decedent feeling (apparently temporarily) "miraculously better" on January 12, 1998, and an entry on July 11, 1997 reporting the decedent with good appetite and without fever, chills, nausea, fatigue, diarrhea or mouth sores.

The court regards those three omitted items as material; as positive events occurring in the plaintiff's otherwise negative and declining course of treatment. Nurse Berry's trial testimony must not omit such important developments. To be admissible as a summary of the records, her testimony must not be skewed to include only the bad and to ignore the good.

Accordingly, the defendants' motion *in limine* to bar Nurse Audrey Berry's testimony is denied, without prejudice to defense

counsel's right to interpose appropriate objections at trial to specific questions or answers.