234 N.J. Super. 409 (1989)
560 A.2d 1290
SEYMOUR ALTER, PLAINTIFF,
v.
RESORTS INTERNATIONAL, INC. DEFENDANTS.
Superior Court of New Jersey, Chancery Division, Atlantic County.
Decided May 12, 1989.
*411 David A. Parker for plaintiff (Parker, McCay & Criscuolo, attorneys).
Jeffrey D. Light for defendant (Horn, Kaplan, Goldberg, Gorny & Daniels, attorneys).
GIBSON, J.S.C.
Plaintiff seeks to specifically enforce an alleged lifetime contract for employment. Defendant contests the existence of the contract as well as its enforceability. The matter is before the court on cross motions for summary judgment and the following represents my findings of fact and conclusions of law.

Factual Background.
Plaintiff, Seymour Alter (Alter), began working as a consultant for defendant, Resorts International, Inc. (Resorts) in 1966 when the company was headquartered in Nassau in the Bahamas. In the mid-1970's, when the prospect of casino gambling in Atlantic City was becoming more of a reality, Resorts began exploring the possibility of opening a casino there and sent plaintiff to act as its "frontman" and real estate advisor. Around that same time Alter became a full-time employee with an annual salary of $35,000 plus other benefits. After casino gaming was legalized in New Jersey in 1976, Resorts became the first casino to be licensed.
During this same time period, Alter was also a personal friend of Resort's president, Jack Davis and its chief operating officer, James Crosby. Alter claims that both Crosby and Davis were aware that he had multiple sclerosis and they both agreed, as far back as the 1960's, that he would remain employed with Resorts for the rest of his life, regardless of his health. He also contends that this promise was reiterated on many occasions both before and after Resorts obtained its casino license. Alter concedes that this "agreement" was oral and that his employment terms were "purposely vague." However, *412 he claims that was necessary so that he could perform any job requested and it was clearly understood, regardless of what he was doing for the company, he would receive $35,000 a year plus expenses and medical benefits.
Following the passage of the Casino Control Act and because of Resorts' need for a casino license, all company employees, including Alter, were required to apply for licensing. The resultant investigation of Alter by the Division of Gaming Enforcement disclosed various problems with his background including charges of bribery and the procuring of prostitutes for Bahamian custom officials. The result was that Alter failed to get a license and Resort's own license approval required it to have no further association with him unless and until he was licensed. As a result, Resort's suspended Alter without pay in 1978.
Alter contends that he then sought to have Davis and Crosby honor his lifetime employment contract. The result was a letter agreement dated August 11, 1981 which, by its terms, was "a settlement of matters outstanding" and provided Alter or his estate with a guaranteed annual "pension" of $35,000 a year (a minimum total of $175,000), health insurance, the payment of certain legal and relocation expenses and the forgiveness of a $21,000 debt. In accordance with the Casino Control Act, Resorts filed a petition with the Casino Control Commission on November 2, 1981 seeking a declaratory ruling as to the propriety of the agreement. Alter joined in the petition claiming that the agreement represented a permissible "retirement plan." The commission, however, rejected the bulk of the agreement and by order of January 5, 1982, permitted Resorts simply to reimburse Alter's legal expenses and continue his health coverage. Alter now claims that it was not made clear to the commission that the above agreement arose out of a "lifetime employment contract."
After the "retirement plan" was rejected, the parties then negotiated a "consulting agreement." That agreement, dated *413 November 7, 1983, called for Alter to render services as a general consultant on hotel matters and provided for compensation at $36,000 a year plus health benefits. Like the previous agreement, however, it was subject to approval by the Casino Control Commission. On April 10, 1984, the commission once again decided to disapprove the agreement. Its findings were incorporated in a 28 page written opinion which addressed a number of issues, several of which were similar to the ones presented here. That disapproval was later affirmed by the Appellate Division. On January 7, 1988, Alter filed a petition seeking reconsideration of the commission's earlier decision but he later withdrew that request. He then filed this suit on June 1, 1988 seeking specific performance of the "lifetime contract" and requesting payment of $225,000 plus interest, that sum apparently representing those monies unpaid by Resorts from the time he was discharged.
Crosby is now deceased and Resorts has not filed any opposing affidavits. Instead, it has submitted the deposition testimony of Jack Davis, who fails to confirm the employment terms alleged by Alter, but concedes it was always intended that Alter be regularly and permanently employed. Resorts has also submitted a variety of documents which support the history related above and which it contends contradict plaintiff's claims. For purposes of its own motion, however, it is prepared to concede Alter's factual version of the facts.

Legal Conclusions.
The leading case in this State on "lifetime contracts" is Savarese v. Pyrene Manufacturing Co., 9 N.J. 595 (1952). Savarese sets forth the general rule as follows:
... in the absence of additional express or implied stipulations as to duration, a contract for permanent employment, for life employment or for other terms purporting permanent employment, where the employee furnishes no consideration additional to the services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party, and therefore, a discharge without cause does not constitute a breach of such contract justifying recovery of money damages therefore. [at 600-601]
*414 As that case points out, there has been a marked reluctance to enforce this type of contract, mainly because the obligations it contains are primarily one-sided.
Agreements of this nature have not been upheld except where it most convincingly appears it was the intent of the parties to enter into such long range commitments and they must be clearly, specifically and definitely expressed. Only then is it grudgingly conceded that not all such contracts are `so vague and indefinite as to time as to be void and unenforceable because of uncertainty or indefiniteness.' 56 C.J.S., Master & Servant, sec. 6, p. 70; 1 Williston on Contracts, sec. 39, p. 110; 135 A.L.R. 646, et seq. [Id. at 601]
Given these principles, the initial question for the court is whether the alleged agreement was "clearly, specifically and definitely expressed." Id. at 600-601. The second question is whether it was supported by "consideration additional to the services incident to the employment...." Ibid. For the reasons about to be related, both questions must be answered in the negative.
Alter claims that the terms of the agreement were well defined but his own affidavit belies that notion. The essential terms, as he asserts, are that he was to receive $35,000 a year for the rest of his life plus expenses, health and medical benefits. Those payments were to be made regardless of what he was doing for the company and whether he was actually working. Leaving aside the fact that Davis' testimony fails to support most of these terms, the primary problem with enforcing such a contract is that the nature of the employment was never defined.
For example, if Resorts had determined to fire Alter, what standard would be used to measure his compliance with the agreement? Alter contends that the terms were "purposely vague" so that he could perform any job that might have been requested of him. The acceptance of that proposition, however, simply gives further support to the conclusion that the agreement lacked the required clarity. Given the extraordinary nature of this type of agreement and the unpredictable effect that such an agreement has on parties, the "responsibilities assumed and the obligations imposed will be neither created nor *415 spelled out by mere inference when they are not clearly and unequivocally expressed in the contract itself." Id. at 603; see also Bird v. J.L. Prescott Co., 89 N.J.L. 591 (Sup.Ct. 1916); Shiddell v. Electro Rust-Proofing Corp., 34 N.J. Super. 278, 290 (App.Div. 1954).
The second reason for refusing to enforce this contract is that it lacks additional consideration. As mentioned in Savarese, a lifetime employment contract must be supported by "consideration additional to the services incident to the employment." Savarese v. Pyrene Manufacturing Co., supra 9 N.J. at 600. Nowhere in plaintiff's affidavit, nor anywhere else, is there support for the conclusion that Alter did anything more than render the services that were usual to his employment. Indeed, plaintiff's brief does not even address this issue. The requirement for additional consideration is simply a test of intent and those courts which have relied on that as a factor have done so as another means of testing whether the parties specifically and definitely intended to make a contract. Id. at 602. Presumably, if the intent is clear and unequivocal, the lack of "additional consideration" would not be critical. Ibid. In this case, that intent is anything but clear and the lack of additional consideration is one more reason for defeating enforceability.
A third defect with this contract relates to the authority of Crosby and Davis to bind Resorts. As already noted, a contract of employment for life is extraordinary and considered outside the regular custom and usage of business. Id. at 603. As a result, the usual inferences which would attach to the authority of a chief executive officer to bind a corporate employer are simply not present. As stated in Savarese,
`The president or other executive officer of a corporation has no authority as such to make a contract that one should remain a corporate employee for life even under a general power `to appoint, remove and fix the compensation of employees'. That any board of directors or other persons responsible for the management of a corporation should give such unusual power to an executive officer cannot be implied. Plain language of the managing board, clearly *416 showing that such was the intention of the corporation, coupled with power actually or impliedly vested in the corporation itself, must be found to justify such a hiring.' [Id. at 604 (quoting from Heaman v. E.N. Rowell Co., 261 N.Y. 229, 185 N.E. 83 (1933)]
In this case, plaintiff does not address this issue and therefore nothing has been asserted regarding any authority under which Crosby or Davis could have bound Resorts to such an extraordinary obligation. That authority will not be inferred. Ibid.
Even if this court were to assume the validity of this contract, there are independent grounds for denying Alter's claim. For example, it must be remembered that he was discharged by Resorts when he was unable to get licensed by the Casino Control Commission. Not only would the Casino Control Act have precluded Resorts from having any employment relationship with Alter thereafter, in this instance, the commission specifically precluded Resorts from associating with him until he was licensed. Although not raised by Resorts, lifetime contracts, even where upheld, only preclude a discharge "without cause." Stated differently, even where all of the elements requisite to the enforcement of such contracts are present, they are enforceable only where the employee does his work "satisfactorily and does not give good cause for his discharge...." Id. 9 N.J. at 601; Eilen v. Tappin's, Inc., 16 N.J. Super. 53, 56 (Law Div. 1951).
In this case, Alter was discharged for good cause. He has not suggested otherwise. When the commission denied his application for a key casino employee license, it found that he had committed acts "equivalent to the disqualifying offense of bribery." The commission also found that he had deliberately lied to that body. See the opinion of the Casino Control Commission dated April 18, 1984 (Docket No. 84-M-3). Since Resorts was precluded from having any relationship with Alter so long as he was unlicensed and since Alter was not able to obtain a license, Resorts had no choice but to discharge him. For this court to accept plaintiff's position, therefore, it would have to assume that during all of the relevant time periods, *417 Resorts intended to continue an employment relationship with Alter even if it meant losing its casino license. Logic and common sense would suggest the contrary. Plaintiff's claims must, therefore, fail even if the validity of the underlying contract is accepted.
Certain collateral issues have been raised which need not be addressed given the conclusions reached above. For example, Resort's argues that plaintiff's claims are barred by collateral estoppel because of the Casino Control Commission's decision to reject the letter agreement of August 11, 1981. As to the appropriateness of having a court invoke collateral estoppel with respect to an issue decided by an administrative agency, see generally Hahn v. Arbat Systems, Ltd., Inc., 200 N.J. Super. 266 (App.Div. 1985) and O'Toole v. Ramsey Bor.Ed.Bd., 212 N.J. Super. 624, 627 (App.Div. 1986). Although not raised, there is a legitimate question as to whether this court should entertain the dispute question at all given the jurisdiction of the commission over the enforceability of contracts with licensees. See N.J.S.A. 5:12-104(b). Collateral to that question and one of the more intriguing issues, is whether the Casino Control Act can affect the enforceability of a contract allegedly entered into before the act ever came into effect. Since N.J.S.A. 5:12-104(b) purports to require commission approval of all agreements by a licensee regarding the "business" of the casino and since plaintiff has not challenged the constitutionality of the act, the answer here would appear to be yes, at least prospectively.

Conclusion.
It is the conclusion of this court that plaintiff's claims regarding an alleged lifetime contract fail for a variety of reasons. Most fundamental, the contract, being extraordinary in nature, lacks the degree of clarity required for enforcement. Not only was there no additional consideration to support the intent plaintiff claims, but the nature of the work to be performed was too vague. Even if the contract were otherwise enforceable, it would not have prevented Alter's discharge for cause *418 when he failed to obtain a casino license in 1978. Plaintiff's motion for summary judgment will therefore be denied. Defendant's motion will be granted.