606 A.2d 336

CHARLES E. GREENWOOD, JR., PETITIONER–APPELLANT, v. STATE POLICE TRAINING CENTER, RESPONDENT–RESPONDENT, AND CAMDEN COUNTY SHERIFF'S OFFICE, RESPONDENT–INTERVENOR.

Argued December 2, 1991—Decided May 18, 1992.

502

*Robert B. Kugler* argued the cause for appellant (*Moss, Powers & Kugler,* attorneys).

*Frank S. Croce,* Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

*Howard S. Wilson,* Special Counsel, submitted a letter in lieu of brief on behalf of intervenor.

The opinion of the Court was delivered by

STEIN, J.

In this case we consider whether the New Jersey Police Training Commission (Commission) had good cause to dismiss petitioner, who has limited vision in his right eye, from a police training program. Camden County employed Charles Greenwood as a temporary sheriff's officer, and assigned him to complete the police training program supervised by the Commission so that he could become a permanent officer. The director of the training program dismissed Greenwood because he feared that an injury to Greenwood's left eye might render him virtually sightless. After a hearing, an administrative law judge (ALJ) found that because the Commission had not shown that Greenwood's visual impairment would affect his ability to complete the training safely or successfully, the Commission had acted without good cause. The Commission rejected the ALJ's conclusion, finding that good cause for termination existed because the Commission had legitimate concerns about Greenwood's safety.

The Appellate Division affirmed the Commission's decision in an unpublished opinion, and also determined that the Commission had rendered its decision within the time limit required by *N.J.S.A.* 52:14B–10(c). We granted certification, 126 *N.J.* 332, 598 *A.*2d 890 (1991).

I

The relevant facts are uncontested. At the age of five, Greenwood contracted a viral infection of the cornea known as

herpes simplex keratitis. The infection caused scar tissue to form over Greenwood's right cornea, significantly blurring his vision in that eye. He retains perfect vision in his left eye and is functionally monocular. As a result, Greenwood's depth perception is substantially impaired, although his peripheral vision is unaffected.

Throughout his youth Greenwood's ophthalmologist imposed no restrictions on his activities and encouraged him to participate fully in athletics. During his school years, Greenwood regularly played softball, basketball, football, and street hockey, and participated in wrestling and gymnastics. He also rode a minibike and a moped. Greenwood's employment history includes work as a tow-motor operator, a cook, a painter, and a cargohandler on a receiving dock. He has had an unrestricted New Jersey driver's license since he was seventeen years old.

At the age of twenty-three Greenwood applied to Camden County for a position as a sheriff's officer. The County required applicants to certify that they had passed a physical examination. Greenwood's physician described the nature of his visual impairment, and certified that Greenwood was medically fit. Greenwood also passed a physical examination given by the County's physician, Dr. Lawrence Zazzo, who advised Greenwood that wearing special safety lenses to protect his unimpaired eye from injury would be prudent.

Camden County hired Greenwood as a temporary sheriff's officer. During the seven months of his employment, his primary responsibility consisted of escorting prisoners from their jail cells to the courtroom. Greenwood also participated in a preliminary training program, learning basic martial arts maneuvers and the use of a baton. Greenwood's impaired vision in his right eye did not affect his training or the performance of his duties.

To qualify for a permanent position with the County Greenwood had to complete a police training course at an approved school. See *N.J.S.A.* 52:17B–68. Camden County assigned

Greenwood to a Commission-run program at the New Jersey Police Academy in Sea Girt. Dr. Zazzo examined Greenwood a second time and, fully informed of Greenwood's visual impairment, certified that Greenwood was "medically fit to participate in the training program without limitations."

During his six-week stay at the Academy Greenwood participated fully in a rigorous physical-conditioning program. He testified that he had trained at the firing range on four occasions, performing well enough that some instructors chided other candidates for not shooting as well as someone with only one good eye. The Commission also required candidates to complete a self-defense program, which included training in boxing, police judo, karate, and the use of a baton. Before beginning the self-defense program, the instructors required the trainees to complete forms disclosing any injuries previously sustained and any existing medical conditions. Greenwood explained his eye infection and the resulting blurred vision. After reading Greenwood's form, an instructor sought confirmation from Captain Challender, the Academy's Director of Training, that Greenwood was fit to participate in the self-defense program.

Concerned about the Academy's liability if Greenwood were to injure his left eye, Challender wrote to Dr. Zazzo. In his letter he explained the self-defense training program in detail, erroneously informed Dr. Zazzo that Greenwood lacked peripheral vision, and inquired whether Greenwood's condition rendered him unfit to participate in the program. Dr. Zazzo replied that Greenwood's "functioning vision from the gross examination of the eye chart is well within our parameters." In his opinion, Greenwood was physically fit to engage in the training, but he noted that in the "worst case scenario" Greenwood might injure his good eye, and might thus become virtually sightless. The doctor again suggested that protective lenses might guard against such an occurrence, but noted that Greenwood had been apprised of the possible consequences of such an injury and would have to proceed at his own risk.

Not satisfied with Dr. Zazzo's opinion, Captain Challender sought a second opinion from Dr. Ralph Lanciano, the ophthalmologist for the New Jersey State Police. Dr. Lanciano examined Greenwood, but did not test his peripheral vision. The doctor then wrote to Captain Challender and the sheriff's department, stating in conclusory terms that because Greenwood was essentially monocular, he was "at great risk for injuring his only eye if put in a combat situation." He therefore recommended that Greenwood refrain from engaging in all defensive training, including boxing, judo, karate, and wrestling. Based on Dr. Lanciano's opinion, Captain Challender dismissed Greenwood from the Police Academy. Camden County then discharged Greenwood from his position as a sheriff's officer for failing to complete the training program.

Greenwood appealed his dismissal from the Police Academy, and the Commission, pursuant to *N.J.S.A.* 52:14B-9 to -10, referred the matter to the Office of Administrative Law. At the administrative hearing, Dr. Kaplan, one of Greenwood's ophthalmologists since childhood, testified that Greenwood had 20/20 vision in his left eye and uncorrectable 20/100 vision in his right eye. He noted that Greenwood's monocular vision would place him at risk of injury were he to engage in certain activities, such as driving at very high speeds at night, or flying commercial aircraft. In Dr. Kaplan's opinion, however, because Greenwood's peripheral vision was unaffected by his condition, he would not be at a disadvantage defending himself, and was physically fit to engage in activities such as boxing, judo, and karate.

Captain Challender testified inaccurately that Greenwood had no peripheral vision, and expressed the opinion that allowing Greenwood to continue in the self-defense program would expose him to an unreasonable risk of injury. Unaware that Greenwood had successfully engaged in firearms training on four occasions, Challender also stated that Greenwood probably could not pass firearms training because "combat shooting requires the use of two eyes."

Dr. Lanciano testified that although he agreed with Dr. Kaplan's medical conclusions, in his opinion Greenwood was physically unfit to train at the Academy because his monocular vision made difficult the determination of movement in an "anterior, posterior, or lateral way." He admitted that Greenwood had the same chance of injuring his left eye as any other candidate, but stated that Greenwood might be at greater risk for injury in general. He insisted that to place Greenwood in a combat situation would not be "appropriate," and admitted that his opinion was influenced by concerns about the Academy's liability if Greenwood injured his unimpaired eye.

The ALJ emphasized that in determining whether the Commission had good cause to discharge Greenwood, "the focus of respondent's decision must be on the appellant's ability to complete the training program." The ALJ found no evidence indicating that Greenwood's lack of depth perception would prevent him from completing the training program or would interfere with his ability to perform the duties required of a sheriff's officer. Neither was there sufficient evidence to support a finding that Greenwood's eye condition would place him at greater risk of injury than any other trainee, or that the risk to Greenwood's left eye was greater than the risk to any other candidate's left eye. The ALJ concluded that Captain Challender had dismissed Greenwood solely because the consequences of an injury to his left eye would be greater for Greenwood than for other trainees. The ALJ also concluded that because Greenwood had been terminated for reasons unrelated to his ability to complete the training program, Greenwood's dismissal from the program and his subsequent dismissal from the Camden County Sheriff's Office were without good cause. The Commission, however, rejected the ALJ's determination that the Academy could dismiss Greenwood only if his eye condition interfered with his ability to complete the training program, concluding that Captain Challender had "acted with good cause in dismissing petitioner based on his concern for petitioner's safety."

Greenwood appealed to the Appellate Division, arguing that the Police Training Commission had erred in determining that Greenwood had been dismissed for good cause. Greenwood also argued that the final decision of the Police Training Commission had not been issued within forty-five days of the ALJ's decision, as required by *N.J.S.A.* 52:14B–10(c), and that therefore the decision of the ALJ should be reinstated.

The Appellate Division rejected both arguments. The court held that "a dismissal of a candidate from an approved school based upon safety concerns pertaining to the candidate * * * is good cause for dismissal." The court also found that the Commission had issued its decision within the forty-five day time period required by the statute.

## II

The Commission has the power and duty to oversee the certification of New Jersey police training schools, instructors, and police officers, and may promulgate rules and regulations necessary to meet its responsibilities. *N.J.S.A.* 52:17B–71(h); *N.J.S.A.* 52:17B–71.7. Pursuant to regulation, the Commission may

> suspend or dismiss a trainee who has demonstrated that he or she will be ineligible for Commission certification, for unacceptable behavior or for *other good cause.*
>
> [*N.J.A.C.* 13:1–7.2(a)(8) (emphasis added).]

█ In the employment context, a rule or contract provision allowing termination only for good cause protects an employee from unreasonable or arbitrary termination. *See Oil, Chem. & Atomic Workers Local No. 4–228 v. Union Oil Co.,* 818 *F.*2d 437, 441 (5th Cir.1987); *Shebar v. Sanyo Business Sys.,* 111 *N.J.* 276, 287, 544 *A.*2d 377 (1988). Courts have found good cause for termination in cases in which the discharge is prompted by a legitimate business concern, *see, e.g., Nora v. Carrier Corp.,* 861 *F.*2d 457, 461 (6th Cir.1988) (employer compelled to reduce size of work force due to poor economic conditions); *Nixon v. Celotex Corp.,* 693 *F.Supp.* 547, 556 (W.D.Mich.1988)

(same); *Cox v. Resilient Flooring Div. of Congoleum Corp.,* 638 *F.Supp.* 726, 735–36 (C.D.Cal.1986) (same), or in which an employee does not perform the job safely or effectively; *see, e.g., Lawrence v. Mars, Inc.,* 955 *F.*2d 902 (4th Cir.1992) (employer presented substantial evidence of employee's poor job performance); *Delta Air Lines v. Air Line Pilots Ass'n,* 861 *F.*2d 665, 674 (11th Cir.1988) (seriously-intoxicated pilot operating commercial airplane), *cert. denied,* 493 *U.S.* 871, 110 *S.Ct.* 201, 107 *L.Ed.*2d 154 (1989); *Kippen v. American Automatic Typewriter Co.,* 324 *F.*2d 742 (9th Cir.1963) (employee intoxicated during working hours); *Seabolt v. Westmoreland Coal Co.,* 703 *F.Supp.* 1235, 1239–40 (W.D.Va.1989) (negligence of two employees resulted in serious accident), *aff'd,* 898 *F.*2d 144, *cert. denied,* —— *U.S.* ——, 111 *S.Ct.* 136, 112 *L.Ed.*2d 103 (1990); *Knights v. Hewlett Packard,* 230 *Cal.App.*3d 775, 281 *Cal.Rptr.* 295, 298 (1991) (employee absent without explanation for over five months).

Conversely, courts have noted that termination would be arbitrary or unreasonable and thus not for good cause if the asserted ground was irrelevant to job performance. *See, e.g., Cook v. Lindsay Oliver Growers,* 911 *F.*2d 233, 237–38 (9th Cir.1990) (firing based on religious beliefs would not be for good cause); *Aiello v. United Air Lines,* 818 *F.*2d 1196, 1201–02 (5th Cir.1987) (employee with excellent work record terminated for conduct that had been condoned on the part of another employee); *Oil, Chem. & Atomic Workers, supra,* 818 *F.*2d at 442–43 (off-duty use and sale of drugs not good cause *per se* ); *Joumas v. Maryland Casualty Co.,* 698 *F.Supp.* 675, 679 (E.D.Mich.1988) (discharge based on age would not be for good cause); *Salazar v. Furr's Inc.,* 629 *F.Supp.* 1403, 1409 (D.N.M. 1986) (firing to prevent pension plan from vesting would not be for cause). Thus, although the good-cause standard eludes precise definition, courts ordinarily uphold findings of good cause when the employee's performance is deficient or when the employee creates a risk of harm to himself or herself or others. An employer must present substantial objective evi-

dence to meet the good-cause standard. *See Lawrence v. Mars, Inc., supra,* 955 *F.*2d 902; *Diggs v. Pepsi–Cola Metropolitan Bottling Co.,* 861 *F.*2d 914 (6th Cir.1988). The few New Jersey courts that have considered the issue of good-cause dismissals are in accord. See *Alter v. Resorts Int'l,* 234 *N.J.Super.* 409, 416–17, 560 *A.*2d 1290 (Ch.Div.1989) (corporation had good cause for discharge when Casino Control Commission required corporation not to employ person who could not qualify for gaming license); *Rogozinski v. Airstream by Angell,* 152 *N.J.Super.* 133, 143–44, 377 *A.*2d 807 (Law Div.1977) (good-cause standard not satisfied when allegations of employee incompetence stemmed from personal animosity and employer lacked clear, specific, and definite evidence), *modified on other grounds,* 164 *N.J.Super.* 465, 397 *A.*2d 334 (App.Div.1979).

■ Although Greenwood does not claim that the Commission's decision violates the Law Against Discrimination (LAD), see *N.J.S.A.* 10:5–1 to –42, that statute suggests limitations on the circumstances that can constitute good cause for dismissal from employment. Specifically, the LAD prohibits an employer from dismissing a handicapped employee because of a disability that does not "reasonably preclude[ ] the performance of the particular employment." *N.J.S.A.* 10:5–4.1. Under the LAD the critical inquiry is "whether the handicapped person can do his or her work without posing a serious threat of injury to the health and safety of himself or herself or other employees." *Jansen v. Food Circus Supermarkets, Inc.,* 110 *N.J.* 363, 374, 541 *A.*2d 682 (1988). An employer may not base a decision to discharge an employee for safety reasons on subjective evaluations or conclusory medical reports. *Id.* at 375, 541 *A.*2d 682. Rather, the employer must produce factual or scientifically-validated evidence indicating that employment of the disabled employee will probably cause substantial injury to that employee or others. *Ibid.* (citing *N.J.A.C.* 13:13–2.8); *see also Andersen v. Exxon Co.,* 89 *N.J.* 483, 496–98, 446 *A.*2d 486 (1982) (expert's opinion insufficient to support discharge when expert did not adequately support conclusion that handicapped employ-

ee could not perform); *Panettieri v. C.V. Hill Refrigeration,* 159 *N.J.Super* 472, 490–93, 388 *A.*2d 630 (1978) (expert must establish causal relationship between disability and inability to perform job requirements).

 Reflecting the strong public policy underlying the LAD, the protection from discrimination based on physical handicap extends to "at-will" employees, who ordinarily may be terminated for any reason or for no reason at all. *See Pierce v. Ortho Pharmaceutical Corp.,* 84 *N.J.* 58, 72, 417 *A.*2d 505 (1980) (discussing at-will-employment rule and public-policy exception); *Jansen, supra,* 110 *N.J.* 363, 541 *A.*2d 682 (applying LAD to firing of at-will employee); *Gimello v. Agency Rent–A–Car Sys.,* 250 *N.J.Super.* 338, 594 *A.*2d 264 (App.Div.1991) (same). Thus, under the LAD, a dismissal based on a physical limitation that does not affect an employee's ability to perform the job safely and effectively cannot constitute good cause for termination. We must infer that the same principle should apply in determining whether good cause exists for dismissal from public employment, irrespective of whether the employee alleges a violation of the LAD. A contrary conclusion not only would violate strong public policy, but would be "particularly repugnant in a society that prides itself on judging each individual by his or her merits." *Andersen, supra,* 89 *N.J.* at 491, 446 *A.*2d 486.

### III

 We hold that an employer does not have good cause to terminate a public employee on the basis of a physical limitation unless there is substantial evidence that that limitation either prevents the employee from adequately performing the job or creates a substantial risk of serious injury to the employee or others. We draw support for our holding not only from the general principles underlying the good-cause standard but from New Jersey's strong public policy against discrimination based on physical handicap.

In determining whether the Commission had good cause to dismiss Greenwood from the Academy, we note that administrative agencies have broad discretion to adjudicate disputes. *In re Vey*, 124 *N.J.* 534, 543–44, 591 *A.*2d 1333 (1991); *Barry v. Arrow Pontiac*, 100 *N.J.* 57, 70–71, 494 *A.*2d 804 (1985). Appellate courts must defer to an agency's expertise and superior knowledge of a particular field. *Clowes v. Terminix Int'l*, 109 *N.J.* 575, 587, 538 *A.*2d 794 (1988); *Mayflower Sec. v. Bureau of Sec.*, 64 *N.J.* 85, 92–93, 312 *A.*2d 497 (1973). Thus, if substantial credible evidence supports an agency's conclusion, a court may not substitute its own judgment for the agency's even though the court might have reached a different result. *Clowes, supra*, 109 *N.J.* at 587, 538 *A.*2d 794; *Henry v. Rahway State Prison*, 81 *N.J.* 571, 579–80, 410 *A.*2d 686 (1980); *accord Abbruzzese v. Berzak*, 412 *F.Supp.* 201, 204 (D.N.J. 1976), *aff'd*, 601 *F.*2d 107 (3d Cir.1979). Agencies, however, have no superior ability to resolve purely legal questions, and that a court is not bound by an agency's determination of a legal issue is well established. *Brambila v. Board of Review*, 124 *N.J.* 425, 437, 591 *A.*2d 605 (1991); *Mayflower Sec., supra*, 64 *N.J.* at 93, 312 *A.*2d 497; *Jamison v. Rockaway Township Bd. of Educ.*, 242 *N.J.Super.* 436, 444–45, 577 *A.*2d 177 (App. Div.1990); *Baylor v. New Jersey Dep't of Human Servs.*, 235 *N.J.Super.* 22, 26–27, 561 *A.*2d 618 (App.Div.1989); *Grancagnola v. Planning Bd.*, 221 *N.J.Super.* 71, 75, 533 *A.*2d 982 (App.Div.1987).

The Commission is obviously familiar with the physical qualifications necessary to complete the police training program and to perform the duties of a police officer or sheriff's officer, and is thus best equipped to decide who is qualified to attend the Academy. Therefore, if the Commission's affirmance of Greenwood's dismissal had been supported by substantial evidence showing that he would be unable to complete the training program or to serve as a sheriff's officer, we would sustain the Commission's action. Here, however, the Commission based its decision on an erroneous understanding of the good-cause re-

quirement. The Commission expressly rejected the ALJ's definition of good cause and determined instead that the good-cause requirement had been satisfied because of its concerns about Greenwood's risk of injury. We disagree with the Commission's conclusion that its apprehension about the possible consequences of an injury to Greenwood constitutes good cause for his dismissal. Each candidate in the training program runs a risk of injury. As long as Greenwood's visual limitation does not significantly interfere with his ability to complete the program or significantly increase the risk that he will be injured or will injure others, dismissal from the program is unjustified. Because the Commission based Greenwood's dismissal on an erroneous understanding of the good-cause requirement, we need not defer to its decision.

■ We also note that even under the proper legal standard, the record does not support a dismissal for good cause because no substantial evidence indicates that Greenwood would be unable to complete the training program. Rather, the record reveals that Greenwood's eye impairment did not interfere with his ability to pursue a variety of physical activities, including those mandated by the program. The uncontradicted evidence in the record indicates that he had performed successfully during his six-week stay at the Academy. Nor was there substantial evidence indicating that Greenwood's impairment will expose him to greater risk of injury than that confronting any other trainee, or that his participation would create a risk of injury to others. Although Dr. Lanciano testified that Greenwood might be at greater risk of injury, he offered no explanation of the connection between any enhanced risk and Greenwood's physical limitation, and offered no objective medical evidence in support of his opinion. Thus, we find no basis in the record to support a determination that Greenwood's impaired vision in his right eye will affect his ability to complete the training program or increase his risk of injury. Neither did his visual limitation affect his ability to perform as a temporary sheriff's officer.

We hold that the Commission discharged Greenwood without good cause and that Camden County's dismissal of Greenwood based on his removal from the training program was therefore also invalid. Camden County must rehire Greenwood as a temporary sheriff's officer at the next available opportunity and must give him an opportunity to complete an authorized training program. We find from this record that the risk of damage to Greenwood's left eye is as insubstantial as it is to any other trainee. Obviously the consequences of such an injury are potentially much greater. We hold that the potential cost to government, if any, for those consequences does not justify Greenwood's dismissal. The "risk to the employee's safety" that constitutes good cause must be substantial. A *de minimis* risk is not sufficient even when its consequences, if realized, are great.

The judgment of the Appellate Division is reversed.

CLIFFORD, J., dissenting.

The Court labors mightily to convert this into some sort of first cousin to an employment-discrimination case, embellishing its opinion with an impressive array of citations to our cases interpreting and applying the Law Against Discrimination, *N.J.S.A.* 10:5-1 to -42, see *ante* 127 *N.J.* at 510-512, 606 *A.2d* at 341-342—this, despite plaintiff's thrice-voiced insistence at oral argument that this "is not in any sense an employment-discrimination case." Relying heavily on cases of that ilk, the Court substitutes its judgment for the considered determination of the people on whom the Legislature has conferred responsibility for the training, education, and safety of police officers who must undergo a statutorily-required training program. The Director of Training at the State Police Training Center in Sea Girt, and the Police Training Commission (PTC) determined, on the basis of more-than-ample evidence flavored with a healthy dash of good sense, that Greenwood's eye condition exposed him to an unacceptable risk because of the consequences to his total vision should he injure his good eye.

The Appellate Division, correctly treating the case as presenting an unexceptional, garden-variety weight-of-the-evidence issue, upheld the decision of the PTC, which dismissed plaintiff from the training program for medical reasons. Greenwood comes to this Court with but a single question as set forth in his petition for certification: whether the PTC's determination that plaintiff's eye condition exposed him to an unacceptable risk was reasonably supported by medical evidence in the record such as constitutes "good cause" under *N.J.A.C.* 13:1-7.2(a)(8). We are not presented with questions involving the legitimacy or rationality of the statutory requirement that sheriffs' officers, given the nature of their duties, must attend a PTC, or of the curriculum requirement of mandatory participation in a self-defense program. Rather, the heart of plaintiff's argument as set forth in his brief is that "[t]he Appellate Division ignored [Dr. Lawrence J. Zazzo's] finding of fitness, and instead focused on a collateral discussion regarding the inappropriateness of the head gear worn during boxing," and that the court below "erred in not giving sufficient weight to the medical opinion expressed in plaintiff's favor."

I would prefer to vacate our Order granting certification of the appeal; but if we are to be recorded on the merits, I would vote to affirm the judgment of the Appellate Division. That court's discussion of the boxing phase of the training program and its potential effect on plaintiff is hardly "collateral" as plaintiff suggests; rather, that discussion is an essential basis of the court's decision. The Appellate Division described the program and plaintiff's circumstance as follows:

> As a part of the training program, Greenwood was required to participate in a 41 hour self-defense program which requires boxing, police judo, karate, and baton training. In the 12 hour boxing session, the trainee wears full leather head gear and 16 ounce leather gloves. In view of Greenwood's condition, Captain Challender [, Director of Training,] became concerned for "his safety and fitness to perform in the other areas of training, specifically the self defense program which requires physical contact." For that reason, he asked Dr. Zazzo, the physician who certified that Greenwood was "medically fit" to participate in the program, for further explanation.

Dr. Zazzo's reply to Captain Challender was not, as Greenwood argues, an unequivocal reaffirmation of his medical fitness. Rather, the letter acknowledged the severe "medical consequences" if, during the training, there was an injury to "the good unaffected eye." The "worst case scenario" was described by Dr. Zazzo as "legal blindness in both eyes." The letter acknowledged a need to protect Greenwood's good eye from injury. In that respect Dr. Zazzo observed: "[p]resent gear used by your Academy for his protection certainly would not afford him safety to the good eye." Although Dr. Zazzo suggested that appellant wear plastic protective lenses, he was not sure whether such lenses would be appropriate while wearing head gear during the boxing trials.

The Appellate Division therefore viewed as "warranted" Captain Challender's continuing concern for plaintiff's safety in light of Dr. Zazzo's ambiguous reply. As the court below observed, Dr. Zazzo's comment that plaintiff had been informed that any injury resulting to the normal eye from training would be at his own risk "begged the issue from the point of view of the training center."

Exactly. Although the evidence does not establish that plaintiff is at greater risk of injury because of his eye condition than is any other trainee, it does establish beyond question that should plaintiff suffer injury to his good left eye, the consequences—total blindness—are far greater for him than for any other candidate. Plaintiff's willingness to run that risk may be viewed as admirable by some, foolhardy by others; but quite apart from that irrelevancy is the undeniable fact that the training center would have to take steps to ensure plaintiff's safety that are not required for other candidates. That circumstance surely was a legitimate consideration for those who have to run the program.

Concerns for plaintiff's physical integrity and for the adequacy of safety measures might not move the members of this Court to make the same decision as that reached by the knowledgeable and experienced authorities responsible for the training program—that is, to dismiss plaintiff from the program. But in the area of training of law-enforcement officers, including sheriffs' officers, we should be particularly sensitive and deferential to the judgment of those who run the program. The qualifications of the members of this Court to second-guess

the Director and the PTC on a narrow issue of the risk encountered in the martial arts as part of a police training program run the gamut from the well-concealed to the non-existent.

I would affirm.

Justice POLLOCK joins in this dissent.

*For affirmance*—Justices CLIFFORD and POLLOCK—2.

*For reversal*—Chief Justice WILENTZ and Justices HANDLER, O'HERN, GARIBALDI and STEIN—5.