# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3074-24

DEPARTMENT OF CHILDREN
AND FAMILIES, DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Petitioner-Respondent,

v.

A.T.[1],

     Respondent-Appellant.

_____

     Argued May 18, 2026 – Decided June 1, 2026

     Before Judges Sabatino and Natali.

     On appeal from the New Jersey Department of Children and Families, Division of Child Protection and Permanency, Case ID No. 24-0020.

     Eric R. Foley argued the cause for appellant (Guzzo Law Firm, attorneys; Eric R. Foley, on the brief).

---

[1] We use initials to identify the parties and certain witnesses in order to preserve the confidentiality of these proceedings. R. 1:38-3(d)(12).

Alicia Y. Bergman, Deputy Attorney General, argued the cause for respondent (Jennifer Davenport, Attorney General, attorney; Janet Greenberg Cohen, Assistant Attorney General, of counsel; Alicia Y. Bergman, on the brief).

PER CURIAM

A.T. appeals from a May 22, 2025 final agency decision of the Assistant Commissioner of the Department of Children and Families (DCF), Division of Child Protection and Permanency (DCPP) adopting an Administrative Law Judge's (ALJ) initial decision that affirmed the DCF's substantiated findings based on A.T.'s action that neglected R.C., who was under his supervision as an Assistant Family Service Worker (AFSW), when he left R.C. on the side of the road during a transport to a supervised visit with R.C.'s family and accordingly placed A.T. on the Child Abuse Record Information (CARI) registry. Because we derive nothing arbitrary, capricious, or unreasonable concerning the Department's determination as it is supported by substantial credible evidence, and comports with the applicable law, we affirm.

I.

We discern the following facts from the record of the hearing before the ALJ. On August 28, 2023, the date of the incident, A.T. had been an ASFW for twenty-two years. A.T. testified he transported R.C. to visits with his mother,

A-3074-24

sibling, doctor appointments, and psychological appointments for approximately two months.

R.B., R.C.'s resource parent, testified that on the day of the incident, A.T. arrived at his home to transport R.C. to a supervised visit with his mother. R.B. stated that A.T. returned back to his home approximately ten minutes later and complained about R.C.'s behavior for roughly the first five minutes that followed. R.B. also testified his other son, M.B., informed him that R.C. was not home.

R.B. then asked A.T. where R.C. was, and A.T. told him that R.C. had "jumped out of the car." After R.B. learned the location of where A.T. left R.C., R.B. stated he immediately grabbed his keys and went to locate R.C. because the road where R.C. was left had no residential areas, houses, or sidewalks, and he was worried about R.C.'s safety.

R.B. located R.C. two miles from his home. R.B. stated R.C. told him he was simply tapping on the side of the car, before A.T. suddenly stopped the car, hit the back of his seat to get his attention, pulled over, and told R.C. to get out and drove off. R.B. testified he then drove R.C. to his scheduled supervised visit and drove him back to his house after it was concluded.

A-3074-24

<u>Investigation Report</u>

Roughly two weeks after the incident an intake worker investigating R.C.'s mother for an unrelated issue spoke with R.C. During her conversation R.C. disclosed that A.T. left him alone in a remote area. The intake worker called the child abuse hotline and described R.C.'s allegations. Pursuant to the referral, DCF's Office of the Conflict Investigation Unit assigned Kelly Williams to investigate the matter. In December 2022, pursuant to Williams' investigation, A.T. was substantiated for neglect based on his conduct during the incident.

In substantiating A.T. for neglect, Williams found that four aggravating factors under N.J.A.C. 3A:10-7.5(a) applied. First, she concluded, the "child's safety require[d] separation of the child from the perpetrator," N.J.A.C. 3A:10-7.5(a)(7), based on R.C.'s statement to his therapist he was worried about his safety and feared he would be abandoned again. Second she determined a finding of "[i]nstitutional neglect," N.J.A.C. 3A:10-7.5(a)(1), was warranted as R.C. was a ward of the State, and was placed at risk of harm by A.T., who although was assigned to ensure his safety, left him alone in an unfamiliar remote area intentionally. Third, Williams concluded the "tender age, delayed developmental status, or other vulnerability of the child," factor enumerated in

N.J.A.C. 3A:10-7.5(a)(3), applied because R.C. was intentionally left in a remote area from the resource home, had no viable way to call for assistance, has not lived in the United States for a majority of his life, was unfamiliar with the area where he was abandoned, and his most recent location was his third foster home placement which he had been at for only a single month. The final aggravating factor she found applicable was N.J.A.C. 3A:10-7.5(a)(4), based on the "significant or lasting psychological or emotional impact" on R.C. Williams premised this finding on statements made by R.C.'s therapist which confirmed he was traumatized as he continued to discuss the incident months later and his expression of fear that he would be abandoned again. The fact that A.T.'s conduct was an isolated incident was deemed a mitigating factor under N.J.A.C. 3A:10-7.5(b)(3). On balance, Williams determined the aggravating factors outweighed the lone mitigating factor.

A.T. appealed the DCF's findings and the matter was transferred to the Office of Administrative Law (OAL) as a contested case. The ALJ heard testimony over the course of two non-consecutive days from R.C.'s therapist, Cindy Scott, L.S.W., Williams, R.C., and R.B. A.T. also testified. Additionally, DCF presented documentary evidence at the hearing, including an investigation summary of the August 28 incident.

5

Williams testified that she worked in the Conflict Unit, which investigates allegations involving DCF employees. Williams explained that A.T. was an AFSW worker assigned to transport R.C. to and from visits. She described R.C. as a sixteen-year-old who had immigrated to America from Brazil, had experienced trauma with his birth family, has been through multiple placements, and was unfamiliar with the area where he was living at the time of the incident.

Williams stated that the referral alleged A.T. left R.C. on the side of a remote road after an argument between them during transport. Williams testified that R.C. reported being picked up alone by A.T. for a visit, during which he listened to music and had his head down while sitting in the passenger side rear seat of the vehicle. After an argument, R.C. stated A.T. accused R.C. of banging on the car, pulled over, and told R.C. to get out of the vehicle. Williams also stated that during the interview, R.C. reported feeling scared and concerned as he was unfamiliar with the area and stated that he had no reliable means of contacting anyone for help as the rural area had spotty cellular service. Williams also provided that during the interview, R.C. said he no longer felt comfortable being transported by A.T. after the incident.

A-3074-24

Williams also interviewed R.B., who stated that A.T. returned to the resource home without R.C., and only after being prompted did he reveal R.C. had been left on the side of the road. R.B. stated as soon as he learned what A.T. had done, he immediately went to locate R.C. as he did not think it was appropriate for him to be left on the side of the road in an area to which he was unfamiliar.

Williams testified that A.T. admitted to leaving R.C. but did not express remorse, stating he did not see a concern because R.C. "thinks he's grown." Williams concluded that A.T.'s actions constituted neglect, citing the child's vulnerability, the remote location, and the lasting psychological impact.

Scott testified that she had been providing intensive in-home therapy to R.C. since March 2023. Scott described R.C. as quiet and polite, but identified he had abandonment issues, distrust of adults, and emotional regulation issues. She explained that after the incident, R.C. experienced a setback in therapy, as it exacerbated his fear of abandonment, created feelings of self-blame, and an increased distrust of adults. Scott stated that R.C. continued to bring up the incident from time to time during their clinical sessions. Scott testified she believed the emotional impact was significant given the duration of time from when the incident happened to what was then current as R.C. continued to raise

A-3074-24

the issue during their sessions. Scott also stated she believed R.C. still required intensive therapeutic intervention.

R.C. testified that on the day of the incident, A.T. picked him up in the afternoon to transport him to a family visit. R.C. stated he was listening to music, tapping on the side of the car, and then A.T. stopped the car and banged on the back seat. R.C. testified that after an expletive-laden exchange, A.T. exited the car, opened the passenger door, told R.C. to get out of the car, and left him on the side of the road. R.C. also stated there were no houses, residences, businesses, sidewalks, road shoulders, or people around and only saw trees nearby.

R.C. described the incident as something that still scared him and he regularly speaks to his therapist about it. He testified that eventually R.B. found him and drove him to his visit. R.C. stated that he apologized to A.T., but A.T. ignored him. R.C. also stated that the incident made him feel unsafe and distrustful of all people, and he did not want A.T. to transport him again.

R.B. stated that he had been caring for R.C. for over a year and described him as hardworking and a positive presence in the home. R.B. recounted that after A.T. left with R.C., A.T. returned alone and only after inquiring with respect to R.C.'s whereabouts, did A.T. reveal R.C. "jumped out of the car."

A-3074-24

R.B. also stated that at no point upon his return to the resource house did A.T. ask for help, merely commenting upon R.C.'s actions as "[d]isruptive." R.B. testified he was concerned for R.C.'s safety, describing the area as remote and unsafe, and stated that R.C. was in shock when found. R.B. also testified that the incident compounded upon R.C.'s distrust of the DCF. R.B. also stated that he and R.C. continued to discuss the incident for as long as five months after and that R.C. struggled with the emotional aftermath, feeling anger and distrust toward the agency.

In his defense, A.T. testified that despite working as a transportation aide, he had not received formal training on handling behavioral issues or provided with supervision protocols. He stated that on the day of the incident, R.C. was banging on the car, switching between hitting the glass and the side panel of the car. A.T. testified that while he was driving, he waved his hand in front of R.C.'s face because he was afraid R.C. would damage the vehicle. He stated that R.C. acknowledged his attempts but continued to bang on the car, and he then pulled the car over and put it in park.

A.T. testified that R.C. then said, "what the F [are] you doing," to which A.T. told R.C. "that I've been trying to get [your] attention to stop the noise [because] it's deafening and it's dangerous" and A.T. was "afraid he's going to

9

break the vehicle['s] . . . window." A.T. testified that R.C. was very aggressive and agitated and R.C. had stated "it's not your f***ing car, what are you going to f***ing do." A.T. claimed he did not tell R.C. to get out of the vehicle but rather he stated they would not be continuing to the visit and offered to return R.C. to the resource home if he stopped banging on the car. A.T. alleged that at that point, R.C. started to exit the vehicle.

A.T. testified that as R.C. exited the vehicle he asked him where he was going and R.C. then violently slammed the door shut, shaking the car. A.T. stated he attempted to reach the assigned case worker, but his phone call wasn't going through, and decided the best course of action would be to drive back to the resource home to get assistance from R.B. A.T. alleged that upon arrival at the resource home his conversation with R.B. was short, and he drove R.B. to the location where he left R.C. After R.C. got in R.B.'s vehicle, R.B. told him he would drive R.C. to the visit and that when they arrived at the visit he accepted R.C.'s apology.

A.T. testified that he acknowledged in hindsight he should not have allowed R.C. to get out of his car but maintained that he did not believe R.C. was at risk because he was in a "safe environment and [his] intention was to get help immediately." A.T. stated he was not aware of R.C. having expressed

10

concerns about the incident until hearing the testimony during the OAL proceedings.

DCF's Initial and Final Decisions

The ALJ issued a detailed written decision, denying A.T.'s appeal and sustaining the DCF's substantiated finding of neglect. The ALJ carefully weighed the testimony and documentary evidence, ultimately crediting the testimony provided by Williams, R.B., and R.C.'s therapist. The ALJ found that on August 28, 2023, A.T., a transportation aide with over twenty years of experience, was responsible for transporting R.C., a seventeen-year-old child in DCF custody, to a supervised family visit. The ALJ noted that A.T. had transported R.C. on prior occasions and was familiar with his duties as a transportation aide, which primarily involved ensuring the safe transportation of children in DCF's care.

The ALJ first recounted the conflicting testimony regarding the incident. According to R.C., he was listening to music and tapping on the car window when A.T. pulled the vehicle over, yelled, exchanged expletives, ordered him out of the car, and drove off. Conversely, A.T. claimed that R.C. exited the vehicle voluntarily and that he attempted to get help by returning to the resource home.

After reviewing the evidence, the ALJ found that A.T. knowingly and intentionally left R.C. on the roadside for an estimated period of ten to fifteen minutes. The ALJ explained that the location where R.C. was left[2] was "remote, [] heavily wooded, . . . [lacked] visible homes, businesses, or buildings that R.C. could go to for assistance . . . had poor cell-phone reception and was unfamiliar to R.C." The ALJ further credited R.B.'s testimony, who described A.T. as spending several minutes complaining about R.C.'s behavior before disclosing that R.C. had been left on the side of the road. The ALJ recounted Scott's statements to Williams that the incident traumatized R.C. The ALJ also recounted her clinical summary which stated that she found the incident had been a significant therapeutic setback even more than a year later and that R.C. fostered significant distrust towards the DCPP.

In recounting Williams' findings, the ALJ noted that in A.T.'s interview with Williams he showed little remorse and was unconcerned for R.C.'s safety. The ALJ determined that A.T. failed to exercise the minimum degree of care required of a DCF employee supervising a child. The ALJ concluded that the facts before him provided that A.T. made no effort to remain close by, call for

---

[2] We have viewed the photo exhibits of the area in the appendices.

help, or deescalate the situation once R.C. exited the vehicle, and thus his actions constituted a clear failure to provide proper supervision.

The ALJ found that after Williams weighed the aggravating and mitigating factors, she concluded the aggravating factors outweighed any mitigating circumstances. Specifically, the ALJ recounted the four aggravating factors Williams found applicable: (1) R.C.'s safety required separation from A.T.; (2) R.C.'s vulnerability due to unfamiliarity with the area and recent immigration; (3) R.C.'s significant and lasting psychological and emotional impact as reported by his therapist; and (4) the institutional nature of the neglect because of A.T.'s role as a DCF employee. The ALJ also explained Williams' finding that the sole mitigating factor was the isolated nature of the incident and affirmed her conclusion this was insufficient to outweigh the aggravating factors.

Accordingly, the ALJ concluded that a preponderance of the evidence showed that A.T. failed to exercise a minimum degree of care in providing proper supervision to R.C., and that his conduct of leaving "R.C. on the side of the road, plac[ed] his physical, mental, and emotional condition in danger of being impaired." The ALJ held that A.T.'s actions constituted inadequate supervision and neglect pursuant to N.J.S.A. 9:6-8.21(c)(4)(b), and affirmed the substantiated finding of neglect.

On May 22, 2025, the Assistant Commissioner issued a final decision and found A.T.'s "exceptions . . . without merit" and that the ALJ "provided a well-reasoned and thorough [i]nitial [d]ecision supporting his findings and credibility determinations." The Assistant Commissioner adopted the ALJ's initial decision and concluded A.T. neglected R.C. pursuant to N.J.S.A. 9:6-8.21(c), affirmed the substantiated finding of neglect, and ordered A.T. to be placed on the CARI registry.

On appeal, A.T. urges us to reverse the final agency decision contending his actions were at no time willful or reckless to support the determination that he neglected A.T. because "his actions were objectively reasonable under the circumstances he face[d]." A.T. maintains that his actions did not "even rise to the level of mere negligence" and argues the "substantiated" finding should be reversed and changed to either "not established" or "unfounded." A.T. also contends that the court's alleged failure to resolve material disputes of fact, make specific credibility findings, and resolve the conflicting testimony, specifically R.C.'s, requires a reversal of the "substantiated" finding and remand the matter. A.T. further contends that the judge failed to make independent findings as to the aggravating and mitigating factors and the lack of an independent analysis

mandates the matter be reversed and remanded for further consideration of the governing factors. We reject all of A.T.'s arguments.

## II.

Our scope of review of a final agency decision is circumscribed. Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011). When reviewing an agency decision, we examine (1) whether the agency action violated "express or implied legislative policies," (2) whether there is substantial evidence in the record to support the agency's decision, and (3) whether in applying the law to the facts, the agency reached a conclusion "that could not reasonably have been made on a showing of the relevant factors." Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018). Where an agency's decision satisfies these criteria, we accord substantial deference to its fact-finding and legal conclusions, recognizing "the agency's 'expertise and superior knowledge of a particular field.'" Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)). We do not "substitute [our] own judgment for the agency's." Ibid. (quoting In re Carter, 191 N.J. 474, 483 (2007)). The party challenging the final administrative action has the burden to

demonstrate grounds for reversal. Lavezzi v. State, 219 N.J. 163, 171 (2014) (citing In re J.S., 431 N.J. Super. 321, 329 (App. Div. 2013)).

Further, it is well settled that "'[a]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference.'" Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J. Super. 52, 56 (App. Div. 2001) (citations omitted). Moreover, "[a]ppellate courts owe deference to [an administrative] court's credibility determination . . . because it has 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" C.R. v. M.T., 248 N.J. 428, 440 (2021) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)). The deferential standard is applied "because an appellate court's review of a cold record is no substitute for the trial court's opportunity to hear and see the witnesses who testified on the stand." Balducci v. Cige, 240 N.J. 574, 595 (2020). "Although we recognize that deference is generally given to an administrative agency charged with interpretation of the law, we are not bound by the agency's legal opinions." Levine v. State, Dep't of Transp., 338 N.J. Super. 28, 32 (App. Div. 2001) (citations omitted).

An "abused or neglected child" is defined under N.J.S.A. 9:6-8.21(c) in pertinent part as a child under age eighteen:

16

whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of [the child's] parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, . . . or by any other acts of a similarly serious nature requiring the aid of the court[.]

[N.J.S.A. 9:6-8.21(c)(4).]

"Parent or guardian" as defined by N.J.S.A. 9:6-8.21(a) includes "a teacher, employee, or volunteer . . . of an institution who is responsible for the child's welfare and any other staff person of an institution regardless of whether or not the person is responsible for the care or supervision of the child."

Only conduct that is "grossly or wantonly negligent" constitutes failure to "exercise a minimum degree of care" under N.J.S.A. 9:6-8.21(c)(4). G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 178 (1999); L.A. v. N.J. Div. of Youth & Fam. Servs., 217 N.J. 311, 332 (2014). The standard "implies that a person has acted with reckless disregard for the safety of others." G.S., 157 N.J. at 179. Whether a defendant's conduct is grossly negligent and, therefore, constitutes abuse or neglect under N.J.S.A. 9:6-8.21(c)(4)(b), is a question of law, which we review de novo. See Dep't of Child. & Families v. T.B., 207 N.J. 294, 308 (2011).

A-3074-24

The Department "is charged with the responsibility to investigate all allegations of child abuse or neglect." Id. at 211. Under regulations associated with Title Nine, allegations that a child has been abused or neglected can either be "substantiated," "established," "not established," or "unfounded." N.J.A.C. 3A:10-7.3(c); see also N.J. Dep't of Child. & Families v. R.R., 454 N.J. Super. 37, 40 (App. Div. 2018).

An allegation shall be "substantiated" if the preponderance of the evidence indicates that a child is an "abused or neglected child" as defined in N.J.S.A. 9:6-8.21 and either the investigation indicates the existence of any of the circumstances outlined under N.J.A.C. 3A:10-7.4 or substantiation is warranted based on consideration of the aggravating and mitigating factors listed in N.J.A.C. 3A:10-7.5.[3] Pursuant to N.J.A.C. 3A:10-7.3(d) "[a] finding of either established or substantiated shall constitute a determination by the Department that a child is an abused or neglected child pursuant to N.J.S.A. 9:6-8.21." Notably, only findings that are substantiated are to be disclosed by DCF "for a Child Abuse Record Information (CARI) check." N.J.A.C. 3A:10-7.7(a).

---

[3] In S.C. v. N.J. Dep't of Child & Fams., our Supreme Court thoroughly charted the development of the four designations under N.J.A.C. 3A:10-7.3(c) and the DCF's evidentiary burden with respect to each category. 242 N.J. 201, 211, 225 (2020).

Against this background, and recognizing the ALJ had the benefit of hearing directly from R.C., R.B., A.T., Williams, and other witnesses to assess their credibility, and also had the advantage of reviewing the exhibits presented in that context, we are satisfied there is ample credible evidence in the record to support the finding that A.T.'s actions and inactions on August 28, 2023, support a finding of substantiated neglect under N.J.S.A. 9:6-8.21(c)(4)(b). We affirm substantially for the reasons set forth in the ALJ's initial decision adopted by the Assistant Commissioner's final decision. We add the following comments.

Contrary to A.T.'s arguments, the ALJ's initial decision reflects that the ALJ clearly engaged in credibility determinations and made sufficient findings of fact. The ALJ acknowledged the conflicting testimony as to what prompted R.C. to exit from the vehicle but ultimately found "R.C.'s statements were corroborated by the credible testimony of [] Williams, [R.]B., and [] Scott." From that comment, we discern the court clearly considered and credited R.C.'s, R.B.'s, Williams', and Scott's testimonies over A.T.'s testimony. Furthermore, there is no dispute the ALJ concluded that R.C. was unjustifiably left on the side of the road. As the ALJ had the opportunity to hear testimony, review exhibits, and make credibility determinations, his determinations as to witness credibility are entitled to our deference in light of his careful consideration of the facts and

detailed, supported findings of fact. See M.M. v. Dep't of Children & Families, 479 N.J. Super. 471, 482 (App. Div. 2024).

Moreover, the record demonstrates that while the ALJ did not explicitly identify in his initial decision the aggravating factors, his findings of facts and conclusions of law clearly reflect his acknowledgment as to the presence of several aggravating factors based on his crediting Williams' investigation summary and testimony. Specifically, the ALJ, in deeming Williams' testimony credible, clearly credited her findings as to the existing aggravating factors, and further accepted her conclusion that "A.T.'s unblemished record [w]as a mitigating factor, but it did not outweigh the aggravating factors." The presence of these factors was supported by the credible record evidence and various testimony that A.T. left R.C. on the side of a remote road which traumatized the child. The Assistant Commissioner ultimately adopted these findings in his final decision.

In sum, we are satisfied the DCF's substantiated finding is neither arbitrary, capricious, nor unreasonable, nor is it contrary to law, and affirm its determination substantially for the reasons outlined by the ALJ's initial decision as it is supported by substantial credible evidence and as adopted by the Assistant Commissioner in his May 22, 2025 final decision.

To the extent we have not otherwise addressed the parties' arguments, it is because we have considered them and concluded they are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(D)-(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division